# TAB 9(a)

**HinckleyAllenSnyder LLP**
ATTORNEYS AT LAW

50 Kennedy Plaza, Suite 1500
Providence, RI 02903-2393
TEL: 401.274.2000
FAX: 401.277.9600
www.haslaw.com

CERTIFIED
R.I. REGISTRY OF MOTOR VEHICLES
OFFICIAL STAMP

AUG - 9 2007

31 Charles F. Dolan

Mitchell R. Edwards
medwards@haslaw.com

BY HAND

RECEIVED

AUG 0 9 2007

RHODE ISLAND MOTOR VEHICLE
DEALER LICENSE & REGULATIONS

Rhode Island Dealers' License and Hearing Board
Division of Motor Vehicles
Attention: Joseph Monteiro, Chief, Enforcement/Regulations Office
100 Main Street
Pawtucket, RI 02860

Re: Bald Hill Realty Co. d/b/a Bald Hill Subaru v. Subaru of New England, Inc.
Complaint No. 070221

Dear Mr. Monteiro:

I am counsel to Subaru of New England, Inc. ("SNE"). Enclosed please find the following papers removing the above-referenced matter to the United States District Court for the District of Rhode Island: Notice of Filing of Notice of Removal with attached Notice of Removal filed in the Federal Court.

Although the enclosed removal papers end the pendency of this matter before the Board unless and until it is remanded, SNE wishes to apprise the Board of certain important information. As the Motor Vehicle Dealers License and Hearing Board is aware, SNE has been for decades a good corporate citizen in the conduct of its business in Rhode Island. SNE values immensely the opportunity to do business in Rhode Island, and for that reason it has made an enormous and important investment in developing the Rhode Island market for Subaru vehicles, products and services through its franchised dealers. SNE also takes its reputation as a good corporate citizen very seriously.

Given this long history and the importance of SNE's reputation, SNE is constrained to point out, even if just briefly via this letter and irrespective of the fact that the above matter will not be proceeding before the Board, certain misleading and potentially prejudicial statements made by Bald Hill Realty Co. d/b/a Bald Hill Subaru ("Bald Hill") in its August 3, 2007 Complaint filed with the Board and subsequent Amended Complaint. At paragraphs 8 through 14 of its Complaint, Bald Hill alleges that in 1999 it joined a class action case against SNE concerning an alleged illegal "option packing scheme," unreasonable performance and termination standards, and other alleged misconduct. Bald Hill's Complaint further suggests that SNE sent it a termination letter



28 State Street, Boston, MA 02109-1775 TEL: 617.345.9000 FAX: 617.345.9020
43 North Main Street, Concord, NH 03301-4934 TEL: 603.225.4334 FAX: 603.224.8350

in 1999 "as a result of Bald Hill joining [the] class action lawsuit against SNE." In its Amended Complaint at paragraph 10, Bald Hill repeats this (baseless) retaliation accusation. Notably, in both its Complaint and its Amended Complaint, Bald Hill does not mention the fact that SNE prevailed fully and completely in the class action case brought by Bald Hill, among others. SNE won in the trial court in Lussier Subaru, et al. v. Subaru of New England, Inc., et al., 286 F.Supp.2d 86 (D.N.H. 2003). The trial court's judgment was affirmed on appeal by the First Circuit Court of Appeals in Lussier Subaru, et al. v. Subaru of New England, Inc., et al., 393 F. 3d 36 (2004). The United States Supreme Court thereafter denied the dealers' request that it grant certiorari. I enclose copies of the published decisions. As the Board will see from these decisions, the dealers' complaints (including Bald Hill's) about alleged illegal "option packing" and related misconduct were found to be without basis in fact or law. At the conclusion of the litigation, the plaintiffs were ordered to pay SNE's costs.

Equally disturbing are Bald Hill's allegations in its Complaint and Amended Complaint about a "retaliatory" termination proceeding initiated by SNE against it in 1999. Although Bald Hill's Complaint and Amended Complaint reference SNE's prior termination letter and claims that SNE issued it in retaliation for Bald Hill's participation in the class action and a prior protest proceeding, Bald Hill fails to disclose to the Board that a federal court found against it on this very issue. During the then pending class action lawsuit, Bald Hill actually sought an order from the United States District Court enjoining SNE's 1999 termination notice, claiming that SNE was acting in a retaliatory manner when it sent that notice of termination. The 1999 termination notice was based upon Bald Hill's failure to seek or obtain approval of repeated secret ownership changes in violation of Bald Hill's Dealer Agreement and Rhode Island law, which were compounded by years of material false representations by Bald Hill concerning its ownership structure. The United States District Court denied Bald Hill's request for an injunction and found that SNE was entitled to proceed with the termination action against Bald Hill. Bald Hill omits all these facts from its Complaint and Amended Complaint. I enclose a copy of the Court's decision in this regard as well. Bald Hill's filings in this matter also omit material information concerning the 1999 proceedings, including among other things that the Court ruled that the parties' 1999 termination dispute properly should be adjudicated before the Court and not this Board.

Finally and without limitation, Bald Hill's Complaint and Amended Complaint also fail to disclose to the Board that well before Bald Hill filed its recent Complaint with the Board, SNE had served upon Bald Hill a lawsuit properly filed in the United States District Court in Rhode Island on June 29, 2007. SNE's lawsuit properly seeks a judgment that Bald Hill materially breached its Subaru Dealer Agreement and that SNE has the right to terminate Bald Hill's Subaru Dealer Agreement and franchise, among other things.

Put simply, Bald Hill's filings in this matter are misleading in material respects. Because SNE has removed Bald Hill's Complaint to the United States District Court,

SNE does not request that the Board take any action based upon this letter except to make it part of the record so as to correct Bald Hill's misstatements. In submitting this letter, and in filing removal papers, please understand that SNE does not acknowledge the Board's jurisdiction over the current dispute between SNE and Bald Hill in any manner.

Thank you for your attention to this matter.

Very truly yours,

Mitchell Edwards /BRE

Mitchell R. Edwards

Enclosures

cc: Michael McEntee, Esquire
Howard M. Cooper, Esquire
Heidi A. Nadel, Esquire
Kathleen M. Genova, Esquire
Kevin J. Rabbitt

**H**

George Lussier Enterprises, Inc. v. Subaru of New England, Inc.
D.N.H.,2000.

United States District Court,D. New Hampshire.
GEORGE LUSSIER ENTERPRISES, INC. d/b/a Lussier Subaru, et al.
v.
SUBARU OF NEW ENGLAND, INC., et al.
**No. 99-109-B.**

Oct. 16, 2000.

Automobile dealership franchisees suing franchisor for alleged misconduct sought preliminary **injunction** preventing franchisor's attempted franchise terminations. The District Court, Barbadoro, Chief Judge, held that evidence was insufficient to establish that termination attempts were baseless retaliation for underlying suit.

Motion denied.

West Headnotes

**[1] Injunction 212 ⚷138.1**

212 **Injunction**
212IV Preliminary and Interlocutory **Injunctions**
212IV(A) Grounds and Proceedings to Procure
212IV(A)2 Grounds and Objections
212k138.1 k. In General. Most Cited Cases

To obtain preliminary **injunction**, plaintiff must demonstrate that: (1) it is substantially likely to succeed on merits of its claim; (2) absent **injunction** there is significant risk of irreparable harm; (3) balance of hardship weighs in its favor; and (4) **injunction** will not harm public interest.

**[2] Injunction 212 ⚷59(1)**

212 **Injunction**
212II Subjects of Protection and Relief
212II(C) Contracts
212k59 Breaches of Contract Which May Be Restrained in General
212k59(1) k. In General. Most Cited Cases

Automobile dealership franchisees suing franchisor for alleged misconduct were not entitled to **injunction** preventing franchisor's attempted franchise terminations absent showing that such attempts were baseless retaliation for underlying suit; termination decisions, although made after franchisees joined suit, were supported by evidence which franchisor only discovered shortly before commencing termination proceedings.

*232 Richard B. McNamara, Wiggin & Nourie, Manchester, NH, William A. Kershaw, Kronick, Moskovitz, Tiedemann & Girard, Sacramento, CA, for plaintiffs.
Michael C. Harvell, Sheehan Phinney Bass & Green, Manchester, NH, William A. Kershaw, Kronick, Moskovitz, Tiedemann & Girard, Sacramento, CA, Howard M. Cooper, Todd & Weld, Boston, MA, for Subaru of New England, Inc.
Michael C. Harvell, Robert J. Cordy, McDermott, Will & Emery, Boston, MA, for Ernest J. Boch, Jr.
Ronald L. Snow, Orr & Reno, PA, Concord, NH, for Joseph A. Appelbe.

***MEMORANDUM AND ORDER***

BARBADORO, Chief Judge.

George Lussier Enterprises, Inc. and six other present and former New England Subaru dealers commenced this class action against Subaru of New England, Inc. (" SNE" ) and its sole shareholder, Ernest Boch, in March 1999. The dealers allege that SNE and Boch have engaged in an " option-packing scheme," by which they used their power to allocate or withhold certain desirable vehicles to coerce the dealers to purchase unwanted accessories. The dealers claim that this practice breaches their dealer contracts and violates federal antitrust laws, the federal RICO statute, and various state dealer protection statutes.[FN1]

FN1. The dealers' factual allegations and legal claims are described in detail in two previous orders. *See George Lussier Enters., Inc. v. Subaru of New England, Inc.*, Civil No. C-99-109-B, 1999 WL 1327396 (D.N.H. Dec.13, 1999) (denying motion to dismiss dealers' antitrust claim against SNE); *George Lussier Enters., Inc. v. Subaru of New England, Inc.*, Civil No. C-99-109-B, Opinion No. 2000 DNH 013, 2000 WL 1466132 (D.N.H. Jan.13, 2000)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(granting motion to dismiss dealers' RICO claims against SNE; granting in part and denying in part motion to dismiss dealers' RICO claim against Boch). The plaintiffs recently filed a Second Amended Complaint asserting additional claims and naming an additional defendant. *See* Doc. No. 147.

In this Memorandum and Order, I address plaintiffs' request that the defendants be preliminarily enjoined from proceeding with what plaintiffs contend is a campaign to retaliate against class members who support this litigation.

## I. *BACKGROUND*

Plaintiffs base their retaliation claim primarily on circumstantial evidence. They ask me to infer that SNE has embarked on a campaign of retaliation from the fact that SNE has initiated termination proceedings against three dealers who are closely associated with this litigation. They have also ***233** produced evidence suggesting that Boch and SNE's senior employees are angry with dealers who have supported the litigation and have attempted to persuade them to abandon the lawsuit. Finally, plaintiffs have produced a witness who claims that a senior SNE employee told him that " Boch will get everyone who goes against him, including the plaintiffs in this lawsuit, one by one, just like he did in the prior litigation." Aff. of Brian Swanson, Pls.' Ex. 1 at 3. I discuss this evidence in greater detail in the sections that follow.

### A. *Subaru of Wakefield*

SNE asserts that it attempted to terminate Subaru of Wakefield because: (i) it kept a sales log containing racist, sexist, and homophobic comments about potential customers; (ii) it violated its agreement with SNE to use SNE's " Data Communications System" (" DCS" ) only for its internal data processing needs; and (iii) it breached its agreement not to involve a Wakefield employee who had previously been implicated in a warranty fraud scheme in further warranty work.[FN2]

FN2. Wakefield was a named plaintiff in this action. However, it settled its claims with the defendants and I recently granted its motion to dismiss its individual claims. *See* Motion of Plaintiff Subaru of Wakefield, Inc. to Dismiss Its Claims With Prejudice (Doc. No. 141).

#### 1. *The Sales Log*

Shortly before SNE instituted termination proceedings against Wakefield in October 1999, it discovered that one of Wakefield's senior managers maintained a sales log containing racist, sexist, and homophobic comments concerning potential customers who had visited the dealership. These comments were made over an extended time period and included statements such as " nigger with a wet dream," " Chinese major piece of shit," " fucking cunt," " Hebrew looking for pennies under the seat," and " Queer Jew." Ex. 5 to Lustbader Aff.[FN3] When SNE informed Wakefield's president, Richard Kalika, of the log, he responded with a letter stating that " I have reviewed ... [the] log as you have suggested and I am dealing with this internal matter appropriately. Wakefield's excellent customer satisfaction record speaks for itself, and belies any theory that Wakefield does not maintain superior relations with its customers." Letter from Kalika to Lustbader of 8/26/1999, Pls.' Ex. 13. Kalika also notified SNE after it initiated termination proceedings that he had warned the employees who had produced the log that they would be discharged if they engaged in similar conduct in the future. *See* Transcript of October 15, 1999 Meeting Between Kalika and Lustbader, Pls.' Ex. 14 at 56.

FN3. " Lustbader Aff." refers to the Affidavit of Philip L. Lustbader, Defendants' Exhibit Number One.

Defendants claim that Wakefield's maintenance of the sales log violates paragraph 4.1 of its Dealership Agreement with SNE. Paragraph 4.1 provides that

[a] Dealer shall safeguard and promote the reputation of Subaru Products and of Fuji, SOA [Subaru of America], Distributor and all other Subaru distributors and dealers. Dealer shall refrain from all conduct which might be harmful to such reputations or to the marketing of Subaru Products or which might be inconsistent with the public interest. Dealer shall avoid illegal, deceptive, misleading or unethical practices.

Defs.' Ex. 24 at 3. Defendants also invoke Paragraph 15.1.12 of the Agreement which authorizes SNE to terminate a dealer due to the " [d]ealer's abuse, misuse, discrediting or otherwise impairing the name or reputation of Fuji, SOA, Distributor, or any other

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Subaru distributor or dealer, or of any Marks or of any Subaru Products."

Plaintiffs concede that the sales log contains inappropriate comments, but contend that termination is unwarranted because: ***234** (i) the owner of the dealership did not know of the comments until after SNE discovered them; (ii) Wakefield's customers were not permitted to see the sales log; and (iii) after SNE began termination proceedings, Wakefield warned the employees who had produced the log that their conduct was unacceptable.

2. *Dealer Communication System*

The DCS is a computerized database of sales information for Subaru's fifty-seven New England dealers. Aff. of Howard F. Eddy, Ex. 26 to Lustbader Aff., at 1. Each dealership has access to the database through a computer terminal located in the dealership. However, SNE's vice president of data processing testified that

[t]he DCS software is designed to allow a dealer to access only its own sales information. The software contains filters which prevent a dealer from accessing its competitors' information. The filters which are in place must be bypassed *intentionally* in order for one dealer to obtain a competitor's data. (The exception to this is in the ability of all dealers to use the system to access by Vehicle Identification Number information regarding a particular vehicle on an occasion when they are asked by a customer to service a vehicle they did not sell. Such access, however, is permissible solely for the car being serviced as part of the non-selling dealer's internal data processing needs, *i.e.*, so the non-selling dealer can confirm warranty recall and some service information). The accessing of a competitor's data for any purpose, let alone for litigation purposes, is not part of any dealership's internal processing needs.

*Id.* at 3. Wakefield's use of the DCS is limited by the terms of a Dealer Communication System Agreement between SNE and its dealers. *See* Dealer Communication System Agreement, Defs.' Ex. 32. This agreement provides in pertinent part thatSNE hereby grants to Dealer a personal, non-transferable and non-exclusive license to access NEDIS [New England Dealer Information System] only from the Dealer's Site and only to satisfy Dealer's internal data processing requirements.

*Id.* at 3.

SNE proposed to locate a Subaru dealership in Danvers, Massachusetts in mid-1996. Wakefield protested SNE's decision by filing suit in state court. *See* Lustbader Aff. at 13. During the course of the state court litigation, Wakefield repeatedly attempted to obtain sales information for the Danvers dealership from SNE. These efforts culminated in an order from the Massachusetts Appeals Court rejecting Wakefield's attempt to obtain the sales data and concluding that the data was " confidential and proprietary." *See* Ex. 23 to Lustbader Aff. Wakefield nevertheless obtained some of the data from the DCS. *See* Dep. of Kalika, Ex. 24 to Lustbader Aff., at 94-95. It then used the information in its litigation against SNE. *See id.;* Aff. of Kalika, Pls.' Ex. 4 (hereinafter " Kalika Aff." ).

Defendants contend that SNE has good cause to terminate Wakefield because it violated the DCS agreement. Wakefield responds by claiming that it did not violate the agreement because: (1) any dealer could have obtained the information from the DCS; (2) SNE did not treat the sales data as confidential or proprietary; (3) Wakefield used the sales data only for its internal data processing requirements; and (4) SNE knew that Wakefield was accessing the sales data and did not object. *See* Kalika Aff.

3. *Larry Olanyk*

SNE determined in 1996 that Wakefield's sales manager, Larry Olanyk, had committed warranty fraud by submitting $91,000 in false service invoices to Subaru of America. This fraud was later described in an order issued by a Massachusetts judge in connection with litigation ***235** between SNE and Wakefield. *See Subaru of New England, Inc. v. Subaru of Wakefield, Inc.*, Memorandum of Decision and Order for Judgment, Sept. 24, 1999, Ex. 2 to Lustbader Aff., at 6. Wakefield fired Olanyk but later re-hired him after giving SNE assurances that it would not permit him to oversee any further warranty work. *See* Lustbader Aff. at 18; Dep. of Scott Scimemi, Ex. 32 to Lustbader Aff., at 174. Notwithstanding its assurances, Wakefield allowed Olanyk to become involved in warranty work on a temporary basis while the person who was hired to perform that work " got up to speed." *See* Letter from Kalika to Lustbader of 08/26/1999, Pls.' Ex. 13. SNE learned that Wakefield had violated its agreement not to allow Olanyk to perform warranty work shortly before it instituted termination

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

proceedings against Wakefield.

SNE claims that it is justified in terminating Wakefield because the dealership violated its agreement with SNE that it would not permit Olanyk to perform warranty work. Plaintiffs challenge this contention by claiming that (1) none of Wakefield's principals were involved in the underlying fraud; (2) SNE agreed that Wakefield could re-hire Olanyk; and (3) Olanyk performed the warranty work only for a short time after he was re-hired.

### B. *Tri-State Subaru*

SNE claims that it is entitled to terminate Tri-State Subaru, Inc. (" Tri-State" ) because Tri-State committed fraud during a " Butting Heads" sales contest sponsored by SNE.[FN4] Under the rules of the Butting Heads sales contest, Tri-State was matched with another dealership in a contest to sell or lease a designated number of vehicles during a one-month period in June 1999. Tri-State earned the contest's $10,000 award by reporting that it has sold or leased its target of forty-one vehicles during the contest period.

> FN4. Tri-State is not a named plaintiff. However, its owner has been a vocal supporter of this litigation.

Two of the vehicles that Tri-State claimed it had leased during the contest had in fact been leased from a Toyota Lincoln Mercury dealership owned by Tri-State's owner, Peter Krause. *See* Lustbader Aff. at 21; Tr. at 31 [FN5]. These two vehicles were in inventory at another Krause-owned dealership, Suburban Subaru, and were delivered to the customer directly. *See* Tr. at 29-32; Letter from Krause to Boch of 9/24/1999, Pls.' Ex. 38. The paperwork for both leases was completed and signed by employees at Suburban Subaru and both leases identified Suburban Subaru as the lessor. *See* Tr. at 59-60; Letter from Vincent Fieseler to Lustbader of 10/14/1999, Defs.' Ex. 76 (hereinafter " Fieseler Letter" ). The proceeds of both leases were paid to Suburban Subaru by the leasing company shortly after the leases were executed. *See* Tr. at 60; Fieseler Letter.

> FN5. " Tr." refers to the transcript of the preliminary **injunction** hearing held before Magistrate Judge Muirhead on January 7, 2000. (Doc. No. 70).

SNE audited Tri-State and the winners of other Butting Heads contests in early August 1999. During the audit process, SNE contacted the leasing company that had funded the leases for the two vehicles and learned that the proceeds from both leases had been paid to Suburban Subaru rather than Tri-State. *See* Fieseler Letter; Letter from Lustbader to Jeffrey Levine, Esq. of 9/30/1999, Defs.' Ex. 74. On August 19, 1999, SNE's vice president for operations, Philip Lustbader, wrote to Krause and requested copies of the leases for both vehicles. *See* Letter from Lustbader to Krause of 8/19/1999, Defs.' Ex. 64. Rather than produce the original leases naming Suburban Subaru as the lessor, Krause caused new leases to be prepared identifying Tri-State as the lessor for both vehicles. *See* Letter from Krause to Lustbader of 8/31/1999, Defs.' Ex. 65. These leases were typewritten and signed but ***236** were left undated. Krause sent copies of the new leases to Lustbader without referencing the original Suburban Subaru leases. *See id.* At approximately the same time, Krause also sent the new leases to the leasing company with instructions to " flat cancel" the old leases and re-book them in Tri-State's name. *See* Letter from Chase to Lustbader of 11/23/1999, Defs.' Ex. 80. The leasing company could not accommodate Tri-State's request because the period within which such cancellations were permitted had expired. *See id.* Krause then caused a third set of leases to be prepared and submitted to the leasing company with instructions to re-book the leases in Tri-State's name. The new leases are handwritten, signed, and bear a June 23, 1999 signature date, even though they were not prepared until late August or early September. *See* Fieseler Letter; Tr. at 34.

Lustbader informed Krause of the fact that he knew that the vehicles had originally been leased by Suburban Subaru in a letter dated September 20, 1999. *See* Letter from Lustbader to Krause of 09/20/1999, Defs.' Ex. 67. On September 24, 1999, Krause wrote to Boch and offered the following explanation for his actions:
A salesperson at our Toyota-Lincoln-Mercury dealership in Northampton, Ma. has sold the Home Stores approximately eight vehicles. This company asked to lease two Subarus. Suburban Subaru had the cars in stock. The cars were leased through [the leasing company] and physically delivered to the Home Store in Northampton. Considering these vehicles were an off-site sale, and I own both dealerships, I, as Dealer Principal, elected to report the leases through Tri-State Subaru. The records at

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[the leasing company] reflect this event. Your personnel have spoken with the owner of the vehicles and they were sold and registered within the time frame of the contest, and in accordance with Subaru of America's Sales Reporting Rules.

Letter from Krause to Boch of 9/24/1999, Pls.' Ex. 38 at 2.

SNE sent Tri-State a termination notice on October 14, 1999, alleging that Tri-State had committed fraud during the Butting Heads sales contest. *See* Letter from Lustbader to Krause of 10/14/1999, Defs.' Ex. 77. In response, Krause provided the following explanation for his actions:

Subaru of New England arbitrarily entered Tri-State Subaru into a Butting Heads contest against Patricks Subaru. It was a race to an objective set by SNE. As the month came to an end, it was determined that Tri-State had an opportunity to make their objective, and Patricks could not. The Home Store deals were thus RDR'd by Tri-State. I again reiterate that these transactions belonged to no specific dealership and were legitimately reported by Tri-State Subaru. The paperwork was adjusted to reflect the same. The customer and the bank were aware and accepted the transactions. In no way were either harmed. There was no fraud.

The original Tri-State contracts contained an error, needed to be resigned and resubmitted. Your conversations with the customer demonstrates that no wrongdoing has been done by Tri-State Subaru.

The information you received from Chase Automotive Finance was, as you already know, inaccurate and a copy of Vincent Fieseler's letter is attached. These transactions were fully funded to Tri-State Subaru and for several months Tri-State has been the dealer of record.

*See* Letter from Krause to Lustbader of 11/1/1999, Defs.' Ex. 78.

### C. *Bald Hill Subaru*

**Bald Hill** Subaru has been an authorized Subaru dealer for more than ten years. The company signed dealership agreements in 1989, 1993, and 1996, in which it represented that Robert Petrarca owned 50% of the dealership's stock and the remaining***237** 50% was evenly split between Robert and Ann Hagan. *See* Defs.' Exs. 96-98. Notwithstanding these representations, Petrarca and the Hagans began in the late 1980s to transfer their stock to members of their respective families. *See* Letter from Joshua Teverow, Esq. to William O'Gara, Esq. of 5/19/1999, Ex. 47 to Lustbader Aff. By 1999, these transfers had resulted in the following ownership structure for the company: Robert Hagan, 1.8%; Anna Hagan, 10.3%; Anna Hagan Webb, 8.6%; Carol Hagan McEntee, 8.6%; James Hagan, 12%; Amy Hagan, 8.6%; Robert Petrarca, Sr., 24%; Robert Petrarca, Jr., 8%; Debra Petrarca Smith, 6.5%; Karen Petrarca, 5%; and Mia Petrarca, 6.5%. *See id.* **Bald Hill** failed to disclose these changes in ownership until SNE learned of them during a deposition of Robert Petrarca in connection with other litigation between SNE and **Bald Hill** on May 17, 1999. *See* Lustbader Aff. at 31.

**Bald Hill's** dealership agreement contains an acknowledgment stating that SNE had entered into the agreement in reliance upon **Bald Hill's** representations concerning the ownership of the dealership. *See* Defs.' Ex. 98 at ¶ 5. It also contains a provision providing that **Bald Hill** may not make any changes in the ownership of the dealership without SNE's prior written consent. *See id.* at ¶ 6. Finally, the dealership agreement authorizes SNE to terminate **Bald Hill** if it makes

Any change in the percentage of beneficial ownership of Dealer, or any transfer of any rights or obligations under the Agreement or a Significant Change of Ownership interest in either case, whether voluntary, involuntary or by operation of law, without the prior written consent of Distributor and, if required by Paragraph 14 of the Agreement, of SOA.

*See* Defs.' Ex. 99 at ¶ 15.1.5. The agreement defines a significant change of ownership to include " the admission of a new partner or shareholder in Dealer." *Id.* at ¶ 2.11.

SNE argues that it is entitled to terminate **Bald Hill** because the dealership repeatedly misrepresented its ownership structure and made numerous significant changes in the ownership of the business without SNE's prior written consent. *See* Letter from Lustbader to Petrarca of 6/25/1999, Ex. 45 to Lustbader Aff. Plaintiffs respond by claiming that SNE's actions are unlawful because: (1) **Bald Hill's** misrepresentations and failures to obtain consent were inadvertent, good faith mistakes; (2) all of the stock transfers were made to members of the Petrarca and Hagan families; and (3) its misrepresentations and failures to obtain consent were of no consequence because Rhode Island law does not

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

permit a distributor such as SNE to withhold consent to the kind of ownership changes that have occurred in this case.

### D. *Defendants' Statements*

Several witnesses testified that Boch and other officials at SNE made statements reflecting their anger toward the dealers who had become involved in their lawsuit. Krause testified that he had a conversation with Boch in which he was accused of being a " ringleader and a back stabber" because he had contributed to a fund for the lawsuit. *See* Tr. at 21. Krause also described a second heated conversation with Boch in which Boch questioned him about the lawsuit and asked him to " get out" of it. *See id.* at 22-23. Robert Petrarca testified when he attempted to speak to a senior SNE employee about changes in ownership that had occurred at his dealership, the employee responded that " they were busy with other things such as motions to dismiss." *See id.* at 114. The employee also told Petrarca that Boch was " surprised" and " hurt" that the Petrarca family had been involved in the lawsuit. *See id.* at 114-115. Finally, Walter Heingartner, another dealer, testified that the same employee attempted to arrange a meeting between Heingartner and Boch and that the employee***238** was " extraordinarily shocked that I was a lead plaintiff in this particular action." *See id.* at 146.

Plaintiffs also produced testimony from Brian Swanson, who testified that his friend, Joseph Appelbe, a vice president for SNE, had told him that: (1) there would be no evidence to support the plaintiffs' claims because " its gone" ; (2) Boch had offered Appelbe an additional $50,000 to remain with SNE after the lawsuit was filed and Appelbe had submitted a letter of resignation; (3) Appelbe had been keeping a book that was worth one to two million dollars to Boch; (4) Appelbe and others had once opened a bottle of champagne to celebrate the fact that SNE had successfully terminated a dealer who had opposed them in other litigation; and (5) Appelbe believed that Boch " will get everyone who goes against him, including the plaintiffs in this lawsuit, one by one just like he did in the prior litigation." *See* Tr. at 160-64; Aff. of Brian Swanson, Pls.' Ex. 1, at 3.

Appelbe characterizes the comments that Swanson attributes to him somewhat differently. He denies that he ever said or implied that documents relevant to the litigation had been destroyed. He denies saying anything to Swanson that would justify an inference that his continued employment with SNE was somehow tied to the litigation, and he denies ever telling Swanson that Boch would retaliate against anyone who challenged him. *See* Aff. of Joseph Appelbe, Pls.' Ex. 52; Tr. at 184-210.

## II. *THE PRELIMINARY INJUNCTION STANDARD*

[1] To obtain a preliminary **injunction**, a plaintiff ordinarily must demonstrate that: " (1) it is substantially likely to succeed on the merits of its claim; (2) absent the **injunction** there is significant risk of irreparable harm; (3) the balance of hardship weighs in its favor; and (4) the **injunction** will not harm the public interest." *Lanier Prof'l Servs., Inc. v. Ricci,* 192 F.3d 1, 3 (1st Cir.1999) (internal quotations and citations omitted).

The plaintiffs have not attempted to demonstrate that they will succeed on the merits of their option-packing claims. Instead, they base their request for injunctive relief on the premise that they will be entitled to a preliminary **injunction** if they can establish that defendants have embarked on a plan to retaliate against dealers who have expressed support for this lawsuit. [FN6] I accept this premise for purposes of analysis.[FN7]

FN6. Plaintiffs argue that I have the power to issue a preliminary **injunction** under the All Writs Act, 28 U.S.C. § 1651 (2000), because the relief they seek is " necessary or appropriate" to the court's jurisdiction. They also claim that preliminary injunctive relief is warranted pursuant to Fed.R.Civ.P. 23(d) because an **injunction** is necessary to protect the absent class members. I have previously determined that the Anti-**Injunction** Act, 28 U.S.C. § 2283 (2000), prevents me from enjoining ongoing state court termination proceedings. *See* Memorandum and Order dated April 17, 2000 (Doc. No. 102), Opinion No.2000 DNH 092. In this Memorandum and Order, I assume for purposes of analysis that I have the power to prevent the defendants from instituting termination proceedings against additional dealers if the evidence demonstrates that they have engaged in a pattern of retaliatory conduct.

FN7. The Magistrate Judge held an evidentiary hearing on plaintiffs' request for a preliminary **injunction** and issued a report recommending that I issue the requested **injunction**. *See* Report and Recommendation (Doc. No. 80). Although I have carefully considered the Magistrate Judge's helpful report, I must make a *de novo* determination of the facts and reach my own decision on the merits without deference to his findings and recommendations. *See* 28 U.S.C. § 636(b)(1) (2000).

### III. *ANALYSIS*

[2] Plaintiffs' preliminary **injunction** motion depends upon their contention that SNE's attempted terminations of Wakefield, Tri-State, and **Bald Hill** are baseless and that the timing of the terminations suggests that they are retaliatory. I reject plaintiffs' motion because they have failed to prove either contention.

***239** SNE has established that Wakefield's senior management followed a regular practice of making racist, sexist, and homophobic comments about potential customers in the dealership's sales log. Although no customers ever saw the log and there is no evidence that Wakefield's owners were aware of this practice until after it was uncovered by SNE, it is undisputed that the comments are extreme, that they appear throughout the log, and that they were made with the knowledge of Wakefield's senior managers. SNE has a compelling interest in avoiding any perception that its dealerships are staffed by racists, sexists, and homophobes. Under the circumstances presented in this case, it therefore had a reasonable basis for concluding that the potential damage that could result from Wakefield's unacceptable conduct warranted the institution of termination proceedings against the dealership.[FN8]

FN8. Because this ground alone justifies SNE's decision to institute termination proceedings against Wakefield, I need not address the other grounds identified in its termination notice.

The evidence supporting SNE's decision to terminate Tri-State is even more compelling. The record reveals that Krause masterminded a scheme to attribute two vehicle leases to Tri-State in order to win the Butting Heads contest even though Tri-State had nothing to do with either lease. The evidence further demonstrates that Krause attempted to conceal from SNE the fact that both vehicles originally had been leased by Suburban Subaru rather than Tri-State by submitting false leases to SNE and by causing false backdated leases to be prepared and submitted to the leasing company. While it may be true, as plaintiffs claim, that Krause had previously instructed his other dealerships to book Subaru sales through Tri-State rather than Suburban Subaru, the fact that his employees failed to follow his instructions does not justify his attempt to make it appear that the vehicles in question originally had been leased by Tri-State. This evidence amply supports SNE's decision to terminate Tri-State.[FN9]

FN9. SNE learned while auditing the winners of other Butting Heads sales contests that another dealership, Subaru of Wilton, had failed to comply with the rules of the contest by counting sales that had not been completed until after the competition had ended. *See* Tr. at 92. Rather than terminating the dealership involved, SNE took back the $10,000 award. *See id.* Plaintiffs argue that Subaru of Wilton was not treated as harshly as Tri-State because it was not involved in the litigation against SNE. I reject this argument because the two cases are distinguishable. Wilton's misconduct was committed by an employee of the dealership without the owner's knowledge. *See* Tr. at 95. Moreover, when the misconduct was discovered, the owner of the dealership dealt with the matter forthrightly. In contrast Krause concedes that he was responsible for the decision to include the leases for the two vehicles in the contest, and the evidence demonstrates that he attempted to conceal his conduct from SNE by submitting false leases in response to Lustbader's request and by causing leases submitted to the leasing company to be backdated to make it appear that they had been signed before the misconduct was discovered by SNE.

The evidence supporting SNE's decision to terminate **Bald Hill** is less dramatic than the evidence supporting the other two termination actions. Although it is undisputed that **Bald Hill** repeatedly

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

breached its obligation under the dealership agreement to seek SNE's consent to changes in ownership in the dealership, and the dealership agreement provides that a failure to obtain consent to acting in ownership constitutes grounds for termination, it appears that **Bald Hill's** violations were both unintentional and nonprejudicial. Nevertheless, SNE's contract with **Bald Hill** gives it a contractual right to terminate the dealership for such violations and plaintiffs have not argued that this provision is unlawful. Under these circumstances, SNE was justified in instituting termination proceedings against **Bald Hill** after it learned that **Bald Hill** had breached its dealership agreement.

I am also unpersuaded by plaintiffs' claim that the timing of the terminations is ***240** suggestive of a retaliatory motivation. While it is true that SNE commenced each termination proceeding within seven months after plaintiffs filed their complaint, it is also true that SNE did not discover the information supporting the terminations until shortly before it commenced termination proceedings against each dealership. Since, as I have already explained, SNE had a good faith basis for each of the terminations, I attach no significance to the fact that it commenced the termination proceedings after plaintiffs filed their complaint. Dealerships are not immune from termination for valid reasons merely because they have filed a complaint against a distributor.

Finally, I am not persuaded by plaintiffs' evidence concerning defendants' allegedly retaliatory mindset. It is unsurprising that Boch and SNE would be angry with business associates who have accused them of engaging in a criminal conspiracy. Merely showing that the defendants are angry or that Boch had asked several of the dealers not to support the litigation does not establish that he and SNE have embarked on a plan to retaliate against the plaintiffs. Finally, while Swanson's testimony concerning his conversations with Appelbe supports plaintiffs' retaliation claim, Appelbe denies the statements attributed to him and I cannot determine from the present record whether Swanson or Appelbe is telling the truth. I do not discount the possibility that Boch and SNE might have conceived of a plan to harass or intimidate dealers who oppose them during this litigation. However, the present record does not demonstrate a likelihood that such a campaign of harassment and retaliation is under way. Accordingly, I deny plaintiffs' request for a preliminary **injunction** (doc. no. 43).

SO ORDERED.

D.N.H.,2000.
George Lussier Enterprises, Inc. v. Subaru of New England, Inc.
122 F.Supp.2d 231, 2000 DNH 220

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**H**

George Lussier Enterprises, Inc. v. Subaru of New England, Inc.
D.N.H.,2003.

United States District Court,D. New Hampshire.
GEORGE LUSSIER ENTERPRISES, INC. d/b/a Lussier Subaru, et al.
v.
SUBARU OF NEW ENGLAND, INC., et al.
**No. CV-99-109-B.**

Sept. 26, 2003.

Automobile dealers brought action against distributor, alleging violations of the Automobile Dealer Day in Court Act (ADDCA), various state dealer statutes, the Racketeer Influenced and Corrupt Organizations Act (RICO), the Sherman and Clayton antitrust acts, and their dealer contracts. On motions for summary judgment, the District Court, Barbadoro, Chief Judge, held that: (1) distributor did not engage in coercive conduct in violation of the Automobile Dealer Day in Court Act (ADDCA) or state dealer acts; (2) distributor's alleged threat to withhold access to vehicles which were either initially withheld from initial allocation process or rejected by dealers unless a dealer agreed to purchase accessories did not give rise to the kind of economic fear that the Hobbs Act was designed to address; (3) market power acquired by distributor by locking dealers into dealership contracts could not substitute for market power necessary to support tying claim; (4) distributor did not breach its contractual obligation to allocate vehicles " equitably" ; and (5) dealers were not injured as result of distributor's alleged fraudulent scheme to conceal alleged options-packing scheme.

Motions granted in part and denied in part.

West Headnotes

**[1] Antitrust and Trade Regulation 29T 269(3)**

29T Antitrust and Trade Regulation
29TIII Statutory Unfair Trade Practices and Consumer Protection
29TIII(D) Particular Relationships
29Tk262 Franchises; Distributorships and Dealerships
29Tk269 Motor Vehicle Dealers
29Tk269(3) k. Practices Prohibited or Required in General. Most Cited Cases
(Formerly 382k871(2) Trade Regulation)

Lack of good faith necessary to support claim under the Automobile Dealer Day in Court Act (ADDCA) must be found in the context of actual or threatened coercion or intimidation; the coercion or intimidation must include a wrongful demand that would result in penalties or sanctions if not complied with. Automobile Dealers' Day in Court Act, § 1, 15 U.S.C.A. § 1221.

**[2] Antitrust and Trade Regulation 29T 269(3)**

29T Antitrust and Trade Regulation
29TIII Statutory Unfair Trade Practices and Consumer Protection
29TIII(D) Particular Relationships
29Tk262 Franchises; Distributorships and Dealerships
29Tk269 Motor Vehicle Dealers
29Tk269(3) k. Practices Prohibited or Required in General. Most Cited Cases
(Formerly 382k871(2) Trade Regulation)

Intimidation necessary to support claim under the Automobile Dealer Day in Court Act (ADDCA) must be actual; the mere fact that a dealer may have felt it had been coerced or intimidated is not sufficient. Automobile Dealers' Day in Court Act, § 1, 15 U.S.C.A. § 1221.

**[3] Antitrust and Trade Regulation 29T 269(3)**

29T Antitrust and Trade Regulation
29TIII Statutory Unfair Trade Practices and Consumer Protection
29TIII(D) Particular Relationships
29Tk262 Franchises; Distributorships and Dealerships
29Tk269 Motor Vehicle Dealers
29Tk269(3) k. Practices Prohibited or Required in General. Most Cited Cases
(Formerly 382k871(2) Trade Regulation)

Accessory purchase provisions of state automobile dealer acts were enacted in part to prevent manufacturers from using improper economic

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

pressure to force dealers to purchase accessories; they were not designed to also prohibit manufacturers from engaging in the generally accepted business practice of offering incentives to encourage dealers to purchase accessories. 10 M.R.S.A. § 1174; M.G.L.A. c. 93B, § 4(1, 2) (2001); R.I.Gen.Laws 1956, § 31-5.1-4(b); C.G.S.A. § 42-133bb; 9 V.S.A. § 4096; N.H.RSA 357-C:1.

**[4] Antitrust and Trade Regulation 29T 269(3)**

29T Antitrust and Trade Regulation
29TIII Statutory Unfair Trade Practices and Consumer Protection
29TIII(D) Particular Relationships
29Tk262 Franchises; Distributorships and Dealerships
29Tk269 Motor Vehicle Dealers
29Tk269(3) k. Practices Prohibited or Required in General. Most Cited Cases
(Formerly 382k871(2) Trade Regulation)
Neither Connecticut nor Vermont automobile dealer acts ordinarily bar a manufacturer from requiring that dealers purchase accessories in order to obtain a benefit to which the dealer is not otherwise entitled. C.G.S.A. § 42-133bb; 9 V.S.A. § 4096.

**[5] Antitrust and Trade Regulation 29T 269(3)**

29T Antitrust and Trade Regulation
29TIII Statutory Unfair Trade Practices and Consumer Protection
29TIII(D) Particular Relationships
29Tk262 Franchises; Distributorships and Dealerships
29Tk269 Motor Vehicle Dealers
29Tk269(3) k. Practices Prohibited or Required in General. Most Cited Cases
(Formerly 382k871(2) Trade Regulation)
Automobile manufacturer's offer of incentives to induce dealer's compliance with manufacturer's demands ordinarily is not coercive, in violation of Automobile Dealer Day in Court Act (ADDCA) or state dealer acts, because the dealer has no entitlement to the property that the manufacturer is offering to provide. Automobile Dealers' Day in Court Act, § 1, 15 U.S.C.A. § 1221; 10 M.R.S.A. § 1174; M.G.L.A. c. 93B, § 4(1, 2) (2001); R.I.Gen.Laws 1956, § 31-5.1-4(b); C.G.S.A. § 42-133bb; 9 V.S.A. § 4096; N.H.RSA 357-C:1.

**[6] Antitrust and Trade Regulation 29T 269(3)**

29T Antitrust and Trade Regulation
29TIII Statutory Unfair Trade Practices and Consumer Protection
29TIII(D) Particular Relationships
29Tk262 Franchises; Distributorships and Dealerships
29Tk269 Motor Vehicle Dealers
29Tk269(3) k. Practices Prohibited or Required in General. Most Cited Cases
(Formerly 382k871(2) Trade Regulation)
Neither the Automobile Dealer Day in Court Act (ADDCA) nor state dealer acts bar all means by which automobile manufacturers may attempt to sell dealers unwanted accessories; rather, they merely forbid the use of coercive means to effect such sales. Automobile Dealers' Day in Court Act, § 1, 15 U.S.C.A. § 1221; 10 M.R.S.A. § 1174; M.G.L.A. c. 93B, § 4(1, 2) (2001); R.I.Gen.Laws 1956, § 31-5.1-4(b); C.G.S.A. § 42-133bb; 9 V.S.A. § 4096; N.H.RSA 357-C:1.

**[7] Antitrust and Trade Regulation 29T 269(3)**

29T Antitrust and Trade Regulation
29TIII Statutory Unfair Trade Practices and Consumer Protection
29TIII(D) Particular Relationships
29Tk262 Franchises; Distributorships and Dealerships
29Tk269 Motor Vehicle Dealers
29Tk269(3) k. Practices Prohibited or Required in General. Most Cited Cases
(Formerly 382k871(2) Trade Regulation)
Automobile distributor did not engage in coercive conduct in violation of the Automobile Dealer Day in Court Act (ADDCA) or state dealer acts when it conditioned its allocation of " discretionary" and " turndown" vehicles, which were either initially withheld from initial allocation process or rejected by dealers, on dealers' purchase of accessories; although uncooperative dealers may have fared less well than those who agreed to accept the conditioning practices, more than 88% of all vehicles were initially allocated to dealers without regard to their accessory purchases. Automobile Dealers' Day in Court Act, § 1, 15 U.S.C.A. § 1221; 10 M.R.S.A. § 1174; M.G.L.A. c. 93B, § 4(1, 2) (2001); R.I.Gen.Laws 1956, § 31-5.1-4(b); C.G.S.A. § 42-133bb; 9 V.S.A. § 4096; N.H.RSA 357-C:1.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**[8] Extortion and Threats 165 ⚿25.1**

165 Extortion and Threats
165II Threats
165k25 Nature and Elements of Offenses
165k25.1 k. In General. Most Cited Cases

Fear of economic loss, generally called " economic fear," is included within the meaning of the statutory term " fear" in Hobbs Act's definition of extortion. 18 U.S.C.A. § 1951(b)(2).

**[9] Extortion and Threats 165 ⚿25.1**

165 Extortion and Threats
165II Threats
165k25 Nature and Elements of Offenses
165k25.1 k. In General. Most Cited Cases

Not every business use of economic fear, however, is inherently unlawful under Hobbs Act; fear of economic loss is a driving force of our economy that plays an important role in many legitimate business transactions. 18 U.S.C.A. § 1951(b)(2).

**[10] Extortion and Threats 165 ⚿25.1**

165 Extortion and Threats
165II Threats
165k25 Nature and Elements of Offenses
165k25.1 k. In General. Most Cited Cases

In determining whether use of economic fear is illegitimate, in violation of the Hobbs Act, in a hard bargaining scenario the alleged victim has no pre-existing right to pursue his business interests free of the fear he is quelling by receiving value in return for transferring property to the defendant, but in an extortion scenario the alleged victim has a pre-existing entitlement to pursue his business interests free of the fear he is quelling by receiving value in return for transferring property to the defendant. 18 U.S.C.A. § 1951(b)(2).

**[11] Extortion and Threats 165 ⚿25.1**

165 Extortion and Threats
165II Threats
165k25 Nature and Elements of Offenses
165k25.1 k. In General. Most Cited Cases

Automobile distributor's alleged threat to withhold access to vehicles which were either initially withheld from initial allocation process or rejected by dealers unless a dealer agreed to purchase accessories did not give rise to the kind of economic fear that the Hobbs Act was designed to address, where dealers did not have a preexisting right to such " discretionary" or " turndown" vehicles. 18 U.S.C.A. § 1951(b)(2).

**[12] Antitrust and Trade Regulation 29T ⚿ 537**

29T Antitrust and Trade Regulation
29TVI Antitrust Regulation in General
29TVI(B) Cartels, Combinations, Contracts, and Conspiracies in General
29Tk537 k. In General. Most Cited Cases
(Formerly 265k12(1.4))

A contractual lock-in ordinarily does not give rise to concerns that the antitrust laws were enacted to address.

**[13] Antitrust and Trade Regulation 29T ⚿ 571**

29T Antitrust and Trade Regulation
29TVI Antitrust Regulation in General
29TVI(D) Illegal Restraints or Other Misconduct
29Tk568 Tying Agreements
29Tk571 k. Economic Power. Most Cited Cases
(Formerly 265k17.5(4))

**Antitrust and Trade Regulation 29T ⚿592**

29T Antitrust and Trade Regulation
29TVI Antitrust Regulation in General
29TVI(E) Particular Industries or Businesses
29Tk592 k. Manufacturers. Most Cited Cases
(Formerly 265k17.5(4))

Market power acquired by automobile distributor by locking dealers into dealership contracts could not substitute for market power necessary to support tying claim, even if lock-in was induced by dealer's alleged misrepresentation that purchase of accessories would be optional; such contractual lock-in did not adversely affect either consumers or competitors in the absence of true market power, regardless of whether the lock-in was induced by misrepresentation or was the result of good faith negotiation. Sherman Act, §§ 1, 3, as amended, 15 U.S.C.A. §§ 1, 3; Clayton Act, § 3, 15 U.S.C.A. § 14.

**[14] Contracts 95 ⚿312(1)**

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

95 Contracts
95V Performance or Breach
95k312 Acts or Omissions Constituting Breach in General
95k312(1) k. In General. Most Cited Cases
Automobile distributor did not breach its contractual obligation to allocate vehicles " equitably" and to generally behave " in a lawful and ethical manner" when it conditioned its allocation of " discretionary" vehicles, which were initially withheld from allocation process, or " turndown" vehicles, which were initially rejected by dealers, on dealers' purchase of accessories; use of discretionary vehicles to encourage actions such as purchase of accessories was expressly authorized by dealer agreements, and reservation of right to allocate turndown vehicles to dealers did not violate the agreements because those vehicles had already passed through agreed-upon allocation system.

**[15] Racketeer Influenced and Corrupt Organizations 319H ⚿62**

319H Racketeer Influenced and Corrupt Organizations
319HI Federal Regulation
319HI(B) Civil Remedies and Proceedings
319Hk56 Persons Entitled to Sue or Recover
319Hk62 k. Causal Relationship; Direct or Indirect Injury. Most Cited Cases
Automobile dealers were not injured as result of distributor's alleged fraudulent scheme to conceal alleged options-packing scheme, as required to support their civil Racketeer Influenced and Corrupt Organizations Act (RICO) claim based on such scheme; any added costs that dealers may have incurred to purchase unwanted accessories or to pay floor plan interest on vehicles that took longer than expected to sell because they were equipped with unwanted accessories would have been directly caused by the option-packing scheme rather than the fraud scheme. 18 U.S.C.A. § 1961 et seq.

**[16] Federal Civil Procedure 170A ⚿173**

170A Federal Civil Procedure
170AII Parties
170AII(D) Class Actions
170AII(D)2 Proceedings
170Ak173 k. Hearing and Determination; Decertification; Effect. Most Cited Cases
District court is required to reassess its class rulings as the case develops; if it appears that the requirements of class action rule are not in fact met after the facts are developed and the case progresses, court may decertify the class. Fed.Rules Civ.Proc.Rule 23(c)(1), 28 U.S.C.A.

**[17] Federal Civil Procedure 170A ⚿181**

170A Federal Civil Procedure
170AII Parties
170AII(D) Class Actions
170AII(D)3 Particular Classes Represented
170Ak181 k. In General. Most Cited Cases
Class of automobile dealers was required to show cause why decertification of class was inappropriate with regard to claim that distributor used coercive means to compel dealers to purchase accessories; whether the allegedly coercive means used by a district manager in any particular case were, in fact, unlawful would require a fact-intensive inquiry into each dealer's interaction with particular district managers. Fed.Rules Civ.Proc.Rule 23(c)(1), 28 U.S.C.A.

*89 Richard B. McNamara,Esq., Wiggin & Nourie, Manchester, NH, William A. Kershaw, Esq., Kronick Moskovitz Tiedemann & Girard, Sacramento, CA, Allan R. Curhan, Esq., Donovan Hatem LLP, Boston, MA, Timothy A. Gudas, Esq., Sulloway & Hollis, Concord, NH, for plaintiffs.
Michael C. Harvell, Esq., Sheehan Phinney Bass & Green, Manchester, NH, William A. Kershaw, Esq., Kronick Moskovitz Tiedemann & Girard, Sacramento, CA, Howard M. Cooper, Esq., Todd & Weld, Robert J. Cordy, Esq., Steven W. Kasten, Esq., McDermott Will & Emery, Boston, MA, Ronald L. Snow, Esq., Concord, NH, for defendants.
Russell F. Hilliard, Esq., Upton & Hatfield LLP, Concord, NH, for amicus.

***MEMORANDUM AND ORDER***

BARBADORO, Chief Judge.
A number of current and former New England Subaru dealers have brought this class action against their distributor, Subaru of New England, Inc. (" SNE" ), its sole shareholder and President, Ernest Boch, and its Executive Vice President and General Manager, Joseph Appelbe. The dealers assert that SNE misused its power to control the vehicle

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

allocation process to coerce them to purchase unwanted accessories. They also charge that defendants employed other coercive means to induce them to purchase accessories and fraudulently concealed SNE's " option-packing" scheme. They claim that defendants violated the Automobile Dealer Day in Court Act (" ADDCA" ), various state dealer statutes, the Racketeer Influenced Corrupt Organization Act (" RICO" ), the Sherman and Clayton antitrust acts, and SNE's dealer contracts. The parties have submitted dueling motions for summary judgement.FN1

FN1. In ruling on these motions, I construe the evidence in the light most favorable to the nonmoving parties and enter summary judgment only if the undisputed material facts demonstrate that they are entitled to judgment as a matter of law. *See* Navarro v. Pfizer Corp., 261 F.3d 90, 94 (1st Cir.2001).

***90 I. *BACKGROUND***

Subaru automobiles are manufactured by Fuji Heavy Industries, Ltd., and distributed in the United States by Subaru of America, Inc. (" SOA" ). Since 1971, SOA has contracted with SNE to serve as its distributor in the New England region. SNE's distribution agreement requires it to purchase a designated number of vehicles from SOA and specifies that SOA may terminate the agreement in certain circumstances if SNE fails to meet its quota. The agreement also obligates SNE to use its best efforts to promote and sell Subaru vehicles and accessories through the use of sales representatives.

SNE has entered into dealership agreements with each Subaru dealership in New England. The dealership agreements incorporate SOA's " Standard Provisions," a document that outlines the general terms and conditions that apply to each dealership. The provisions provide that " it will be necessary for Dealer to order and purchase Cars, subject to availability, in adequate quantities and on a regular periodic basis in order for Dealer to achieve adequate sales performance." Appendix to Defs.' Mot. for Summ. J. (Defs.' App.) at Tab 57, Burbank Aff., Ex. G, ¶ 11.1. They also state, however, that " Subaru Products may not be available to Dealer in sufficient supply from time to time because of production limitations or other factors." *Id.* at ¶ 11.3 In an effort to assure dealers that SNE will allocate vehicles fairly, the provisions require SNE to " allocate all affected Subaru Products equitably, using appropriate factors such as the respective inventory levels and sales performance of Distributor's dealers during a representative period of time immediately prior to such allocation." *Id.* SNE also " has the sole responsibility of performing its obligations ... in a lawful and ethical manner." *Id.* at ¶ 2.2.

**A. *Fair Share II***

From February 1, 1987 until early 2001, SNE used the " Fair Share II Distribution System" to allocate vehicles. Fair Share II's stated purpose was to allocate vehicles " in a manner, that, in SNE's opinion, will maximize the business opportunity for both SNE and its dealers consistent with SNE's desire to allocate vehicles fairly and equitably." *See* Defs.' App. at Tab 60, Eddy Aff., Ex. A. Fair Share II used a formula based largely on past sales performance to allocate most vehicles.

**1. The Allocation Formula**

Fair Share II's allocation formula consisted of fixed and variable components. The fixed component was based on the higher of a dealership's planned sales volume or its average actual sales for the three years subsequent to the adoption of Fair Share II. The variable component was based primarily on a dealer's rate of sales over time. A dealer's " days supply," the number of days it would take the dealer to sell its inventory at its current sales rate, thus was critical to dealers who wished to gain more vehicles in subsequent allocations.FN2 SNE used the allocation formula to initially allocate 88.5% of the 124,976 vehicles that SNE sold during the ***91** class period. *See* Appendix to Pls.' Mot. for Summ. J. (Pls.' App.) at Tab 91, Neels Report, Ex. 2.

FN2. A dealer's days supply was " calculated every day a sales report [was] generated by taking the total number of vehicles reported ... minus allowable demos. This number [was] divided by the base sales rate established during the most recently concluded two complete industry months." Defs.' App. at Tab 60, Eddy Aff., Ex. A.

**2. Discretionary Vehicles**

Fair Share II initially authorized SNE to withhold up to 10% of each vehicle shipment from the regular allocation process, but SNE later revised the plan to

permit it to withhold up to 15% of Legacy models and up to 10% of all other models. Def's App. at Tab 60, Eddy Aff., Ex. A., Ex. F. The plan provided that these " discretionary vehicles" were " to be used as demonstrators by [SNE]; vehicles used for major auto shows; vehicles set aside to assist dealers who, at the sole discretion of [SNE], need assistance; and vehicles delivered to VIPs." *Id.* at Ex. A. Elsewhere, the plan characterized discretionary vehicles as vehicles that were to be used for " purposes such as market action [s]." *Id.* Discretionary vehicles comprised 11.5% of all vehicles distributed by SNE during the class period. Pls.' App. at Tab 91, Neels Report, Ex. 2.

### 3. Turndown Vehicles

SNE's dealers rejected approximately 20% of the vehicles that were initially allocated to them under Fair Share II. *See* Pls.' App. at Tab 89, Neels Aff., Ex. 7. Although Fair Share II did not specify how these " turndown" vehicles should be reallocated, SNE reserved the right to redistribute them to dealers of its choosing.

### B. *Accessories*

SNE distributes vehicles with a variety of accessories that are installed by or at SNE's direction.[FN3] Vehicles distributed by SNE during the class period were equipped with more than $53 million in accessories, resulting in an average charge to dealers of $427 per vehicle.[FN4] *See id.* at Ex. 3.

FN3. Vehicles are also often equipped with accessories installed by Fuji Heavy Industries at the factory. I use the term " accessories" more narrowly to refer only to accessories installed after SNE receives a vehicle from SOA.

FN4. All dollar values cited in this Memorandum and Order are stated in 2001 dollars.

SNE selected the mix of accessories that were installed on turndown and discretionary vehicles during the class period. While SNE claims that dealers were free to choose whether accessories would be installed on regular allocation vehicles, the dealers assert that SNE used a variety of coercive measures to pressure them to also purchase accessories for these vehicles. During the class period, the average charge to dealers for accessories installed on turndown vehicles was $490 per vehicle, the average charge for accessories installed on discretionary vehicles was $742 per vehicle, and the average charge for accessories installed on regular allocation vehicles was $338 per vehicle. *See id.* at Ex. 2.

SNE derived a significant share of its profit from the sale of accessories. To encourage such sales, it paid its district managers commissions on accessory sales that typically amounted to between 40% and 60% of their total compensation. District managers were not entitled to these commissions unless their average gross profit on such sales met a prescribed target, which initially was $150 but which was later reduced to $140. The $140 target required district managers to average approximately $475 in accessory sales per vehicle in order to earn any accessory-based commission for that period. *See* Pls.' App. at Tab 33, Boch Aff., ¶ 53. SNE also provided district managers with " focus letters" identifying overstocked accessories that they were encouraged to sell.

### *92 C. *Conditioning*

Plaintiffs have produced both statistical and anecdotal evidence to support their contention that SNE required dealers to purchase accessories for regular allocation vehicles in order to obtain access to turndown and discretionary vehicles. Plaintiffs' statistical evidence consists of a multiple regression analysis using data obtained from SNE. Plaintiffs' expert, Dr. Kevin Neels, contends that this analysis establishes " a strong and statistically significant relationship between the volume of accessories purchased by Dealers and the number of discretionary and turndown cars they subsequently purchased." Pls.' App. at Tab 91, Neels Report at 19. According to Dr. Neels, " [d]epending upon the model one considers, [the data] show[s] that $1,000 per car in accessory purchases results in a dealer receiving, on average, from 1.6 to 4.3 additional discretionary cars in subsequent allocations, and from 1.5 to 3.3 additional turndown cars. In all cases, the results were statistically significant, indicating that they represent systematic effects, and are highly unlikely to be the result merely of random variation." *Id.*

Plaintiffs' anecdotal evidence consists primarily of statements obtained from dealers and former

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

employees of SNE. Some of these statements specifically allege that SNE's district managers conditioned access to turndown and discretionary vehicles on a dealer's agreement to purchase accessories for regular allocation vehicles. *See* Pls.' App. Tab 21, Prevatt Depo. at 107-08; Tab 43, Smith Oral Aff. at 13; Tab 17, Marino Depo. at 105-06. Other statements describe additional techniques that district managers used to induce dealers to purchase accessories. For example, district managers sometimes altered the color and model mix of vehicles assigned to particular dealers or otherwise tampered with computer-based allocations. *See* Pls.' App. at Tab 21, Prevatt Depo. at 47-48. On other occasions, district managers refused to fill " sold orders" from dealers who did not purchase enough accessories.[FN5] Pls.' App. at Tab 25a, Smith Depo. at 97-98. District managers allegedly also told dealers that they would suffer in unspecified ways if they did not purchase accessories for regular allocation vehicles.

FN5. A " sold order" results when a dealer sells a car that the dealer does not presently have on his lot, but that SNE lists in its inventory. The dealer submits the " sold order" to SNE for fulfillment.

#### D. *Concealment*

Plaintiffs assert that SNE repeatedly misled them concerning its conditioning practices. On November 21, 1996, Appelbe and SNE employee, Richard Cirami, sent a letter to the dealers stating that " *accessories are strictly optional!* You do not have to purchase *any* accessories on any Subaru you purchase from SNE ...." Pls.' App., Tab 54 (original emphasis). At a dealers' advisory board meeting on October 23, 1996, SNE's representatives informed the dealers that " no vehicles will be pre-accessorized in the future with the exception of Safari and Rally [models] which the dealers will receive one introductory vehicle and then order as they desire." Pls.' App., Tab 53. In a March 10, 1998 letter to dealer Thomas Camilleri, an SNE representative similarly stated that " [y]ou are always entitled to purchase vehicles with or without port installed accessories ...." Pls.' App., Tab 58. Plaintiffs contend that these statements were false because SNE concedes that it selected the accessories that were installed on discretionary and turndown vehicles, and the above-cited evidence demonstrates that ***93** dealers also were coerced into purchasing accessories for regular allocation vehicles.

### II. *ANALYSIS*

Plaintiffs' claims can be grouped into three categories for purposes of analysis. The first category consists of claims challenging both SNE's admitted practice of conditioning access to turndown and discretionary vehicles on a dealer's agreement to purchase accessories for those vehicles, and its alleged practice of conditioning access to turndown and discretionary vehicles on a dealer's agreement to purchase accessories for regular allocation vehicles.[FN6] The second category consists of claims that defendants misled them concerning SNE's conditioning practices. The third category includes claims alleging that defendants used other coercive means in addition to conditioning to induce dealers to purchase accessories.

FN6. I refer to both forms of conditioning collectively as SNE's " conditioning practices."

In the sections that follow, I offer my reasons for concluding that plaintiffs' first and second category claims are not viable. I also explain why plaintiffs' third category claims may not be amenable to class action treatment. In brief, I conclude that SNE's conditioning practices do not violate the ADDCA or the state dealer acts and will not support a RICO extortion claim because they are not coercive; they do not violate the antitrust laws because SNE lacks market power in the relevant tying product market; and they do not breach SNE's dealer agreements because they are not unlawful, unethical, or inequitable. Plaintiffs' second category claims fail because plaintiffs cannot demonstrate that they were injured by SNE's alleged fraud scheme. Finally, although plaintiffs have produced evidence that conceivably could support many of their third category claims, those claims are subsidiary to the first category claims and, by themselves, may not warrant class action treatment because common questions do not predominate and a class action would not be superior to other forms of adjudication.

I explain my reasoning as it bears on each category of claim in turn.

#### A. *First Category Claims*

##### 1. The ADDCA and State Dealer Acts

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Plaintiffs claim that SNE's conditioning practices violate the ADDCA and the state dealer acts. I evaluate these claims by first describing the federal and state statutes on which the claims are based.

**a. *The ADDCA***

The ADDCA provides automobile dealers with a cause of action for damages resulting from a manufacturer's failure " to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise with [the] dealer." FN7 15 U.S.C. § 1222 (1998). The term " good faith" is defined as:

FN7. SNE does not challenge plaintiffs' contention that it is an " automobile manufacturer" as that term is defined in the ADDCA. *See* 15 U.S.C. § 1221(a) (1998) (an automobile manufacturer is " any person, partnership, corporation, association or other form of business enterprise engaged in the manufacturing or assembling of passenger cars, trucks, or station wagons, including any person, partnership, or corporation which acts for and is under the control of such manufacturer or assembler in connection with the distribution of said automotive vehicles" ).

the duty ... to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party: *Provided,* That recommendation, ***94** endorsement, exposition, persuasion, urging or argument shall not be deemed to constitute a lack of good faith.
15 U.S.C. § 1221(e) (original emphasis).

[1][2] The First Circuit has determined that good faith under the ADDCA has a " ' limited and restricted meaning.' " *H.D. Corp. of P.R. v. Ford Motor Co.,* 791 F.2d 987, 990 (1st Cir.1986) (quoting *Wallace Motor Sales, Inc.,* 780 F.2d 1049, 1056 (1st Cir.1985)). Lack of good faith " ' must be found in the context of actual or threatened coercion or intimidation.' " *Id.* The " ' coercion or intimidation must include a wrongful demand that would result in penalties or sanctions if not complied with.' " *Id.* Further, it " ' must be actual; the mere fact that a dealer may have felt it had been coerced or intimidated is not sufficient.' " *Id.*

**b. *The State Dealer Acts***

All of the states in which SNE operates have enacted statutes which, like the ADDCA, are designed to protect dealers from coercive and other unreasonable practices by manufacturers. New Hampshire's dealer statute is typical. It provides, in pertinent part, that it is unlawful for a manufacturer to " coerce or attempt to coerce" any dealer to
Order or accept delivery of any motor vehicle or vehicles, appliances, equipment, parts or accessories therefor, or any other commodity not required by law, which such motor vehicle dealer has not voluntarily ordered, or order or accept delivery of any motor vehicle with special features, appliances, accessories or equipment not included in the list price of such motor vehicles as publicly advertised by their manufacturer ....

N.H.Rev.Stat. Ann. (" RSA" ) § 357-C:3 (1995 & Supp.2002).FN8

FN8. Unlike the other New England states which leave the term " coerce" undefined, New Hampshire defines the term as " the failure to act in a fair and equitable manner in performing or complying with any terms or provisions of a franchise or agreement; provided, however, that recommendation, persuasion, urging or argument shall not be synonymous with ' coerce' or lack of ' good faith' ." RSA 357-C:1, XX.

The Maine, Massachusetts, and Rhode Island dealer acts similarly make it unlawful for a manufacturer to " coerce, or attempt to coerce" a dealer to purchase accessories.FN9 Maine Rev. Stat. Ann. tit. 10, § 1174(2) (1997 & Supp.2002); FN10 Mass. Gen. Laws Ann. Ch. 93B § 4(2)(1997 & Supp.2003); FN11 R.I. Gen. Laws § 31-5.1-4(b) (2002). The Connecticut dealer act makes it unlawful for a manufacturer to " require" a dealer to purchase accessories, Conn. Gen.Stat. Ann. § 42-133bb (2003), and the Vermont dealer act makes it unlawful for a manufacturer to " require or to coerce" a dealer to purchase accessories, Vt. Stat. Ann. tit. 9 § 4096 (2002).

FN9. Maine omits the comma: " coerce or attempt to coerce." Maine Rev. Stat. Ann. tit. 10, § 1174(2) (1997 & Supp.2002).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN10. The Maine Legislature amended the Maine dealer act in 1997 to also state that " [t]he allocation of new motor vehicles in the State must be made on a fair and equitable basis." Maine Rev. Stat. Ann. tit. 10, § 1174(3)(A) (Supp.2002). Plaintiffs do not base their dealer act claims on this provision.

FN11. The Massachusetts legislature amended the Massachusetts dealer act in 2002 to specifically allow distributers to use up to 15% of all vehicles for discretionary purposes. Mass. Gen. Laws Ann. Ch. 93B § 4(b) (1997 & Supp.2003). Since this amendment was not in effect during the class period, it does not alter my analysis.

Plaintiffs argue that they need not prove that SNE's conduct was coercive to support their state dealer act claims. They base this argument on the First Circuit's ***95** decision in *General GMC, Inc. v. Volvo White Truck Corp.,* 918 F.2d 306 (1st Cir.1990), which concluded that the Massachusetts dealer act " may encompass broader conduct ... than mere coercion and intimidation." *Id.* at 308. Plaintiffs' reliance on this excerpt is misplaced, however, because the First Circuit was applying § 4(1) of the Massachusetts dealer act, which broadly prohibits " any action which is arbitrary, in bad faith, or unconscionable ..." , *id.* (quoting Mass. Gen. L. Ch. 93B, § 4(1)), rather than § 4(2), which is at issue here and which requires proof that a manufacturer " coerced or attempted to coerce" a dealer to purchase accessories.[FN12] Obviously, I cannot ignore the coercion requirement contained in § 4(2) of the Massachusetts act and all but two of the other dealer acts simply because other sections of the acts do not require proof of coercion. Accordingly, I reject plaintiffs' contention that coercion is not an element of those state dealer acts that expressly require proof of coercion.

FN12. These provisions were recodified by the 2002 amendment to the act. *See* Mass. Gen. Laws Ann. Ch. 93B § 4(b) (1997 & Supp.2003).

[3][4] Plaintiffs argue in the alternative that even if coercion is a necessary element of an accessory conditioning claim under most of the state dealer acts, their use of the term does not require a wrongful demand and a threat of sanctions as is the case under the ADDCA. Plaintiffs thus appear to assert that a manufacturer acts coercively whenever it conditions access to anything of value on a dealer's agreement to purchase accessories. I also reject this argument. The accessory purchase provisions of the state dealer acts were enacted in part to prevent manufacturers from using improper economic pressure to force dealers to purchase accessories. Nothing in the language, structure, or legislative history of the acts suggests that they were designed to also prohibit manufacturers from engaging in the generally accepted business practice of offering incentives to encourage dealers to purchase accessories. Accordingly, if a state dealer act requires proof of coercion, I construe that requirement to embody the same type of coercion as is required under the ADDCA. *See Colonial Dodge, Inc. v. Chrysler Corp.,* 11 F.Supp.2d 737, 744 (D.Md.1996) (noting that " ' coercion' under both the [Maryland Dealer Act] and the ADDCA embodies the same concept, and accordingly the same analysis applies." ).[FN13]

FN13. Plaintiffs have not offered a distinct argument based on the text of either the Connecticut dealer act, which makes it unlawful for a manufacturer to " require" the purchase of accessories, Conn. Gen.Stat. Ann. § 42-133bb, or the Vermont dealer act, which makes it unlawful for a manufacturer to " require or to coerce" such purchases, Vt. Stat. Ann. tit. 9 § 4096. This is understandable because, while neither act expressly requires proof of coercion, the accessory purchase provisions of both acts share the same legislative purpose as the other dealer acts at issue in this case: that is, to prevent manufacturers from using undue economic pressure to compel dealers to purchase accessories. Thus, while I recognize that a manufacturer would violate both states' acts if it required dealers to purchase accessories to obtain a dealership or to obtain something of value to which the dealer is otherwise entitled, I do not construe either act to ordinarily bar a manufacturer from requiring that dealers purchase accessories in order to obtain a benefit to which the dealer is not otherwise entitled.

### c. *Analysis*

[5] As I have noted, coercion under both the ADDCA and the state dealer acts requires a wrongful demand

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

coupled with a threat of sanctions. The clearest cases of coercion under this definition are those in which a manufacturer threatens to withhold what it knows to be a dealer's property***96** if the dealer refuses to comply with the manufacturer's demands. Such conduct necessarily is coercive because the manufacturer is using an unlawful threat to induce compliance with the manufacturer's demands. In contrast, a manufacturer's offer of incentives to induce compliance ordinarily is not coercive because the dealer has no entitlement to the property that the manufacturer is offering to provide. *See, e.g., Cabriolet Porsche Audi, Inc. v. Am. Honda Motor Co.,* 773 F.2d 1193, 1210 (11th Cir.1985) (offer of extra vehicles from a pool of discretionary vehicles is not coercive); *Colonial Dodge,* 11 F.Supp.2d. at 744 (same). This case appears to qualify as a permissible use of incentives rather than an impermissible use of sanctions under this dichotomy because plaintiffs agree that they had no contractual right to receive either turndown or discretionary vehicles.

[6] Plaintiffs nevertheless offer two arguments to support their claim that SNE's conditioning practices were coercive. First, they assert, without offering any argument or supporting authority, that even if SNE can control the allocation of turndown and discretionary vehicles for most purposes, it cannot use the allocation process for " the legislatively forbidden purpose of selling unwanted accessories." Pls.' Mem. at 41. The difficulty with this argument is that it finds no support in the statutory language on which it is based. Neither the ADDCA nor the state dealer acts bar all means by which manufacturers may attempt to sell dealers unwanted accessories. Rather, they merely forbid the use of coercive means to effect such sales. Thus, I reject plaintiffs' claim that SNE's practices are coercive solely because they allegedly were developed to encourage dealers to purchase accessories.

[7] Plaintiffs next contend that even if the ends that SNE's alleged conditioning practices were designed to achieve do not make its practices coercive, its chosen means-the use of its power to allocate turndown and discretionary vehicles-is coercive. This argument begins with the major premise that an otherwise permissible incentive program will be deemed to be coercive if it threatens to deny dealers access to resources that they require to conduct their operations. It then proceeds with the minor premise that plaintiffs required access to turndown and discretionary vehicles to conduct their operations. I accept the major premise that underlies plaintiffs' argument. For example, I agree that a manufacturer's threat to deny access to all or substantially all vehicles to dealers who refuse to purchase accessories would be coercive regardless of whether the manufacturer was contractually entitled to allocate vehicles to dealers of its choosing. I ultimately am unpersuaded by plaintiffs' argument, however, because the facts do not support their minor premise. In other words, the power that SNE retained under Fair Share II to control the allocation of turndown and discretionary vehicles simply was not sufficient to qualify SNE's use of that power as coercive.

Plaintiffs do not challenge SNE's contention that its dealers for the most part were highly successful during the class period when compared both with other Subaru dealers and other automobile dealers in general. While uncooperative dealers might have received fewer of the most desirable vehicles to sell and thus may have faced the prospect of smaller allocations if, as a result, they failed to sell vehicles as rapidly as their more cooperative peers, the record is devoid of evidence suggesting that SNE's conditioning practices threatened any dealer's ability to conduct successful business operations. The mere fact that uncooperative dealers may have fared less well under Fair Share II ***97** than those who agreed to accept the conditioning practices, does not mean that SNE's use of the practices was coercive. An incentive program does not become coercive merely because it produces losers as well as winners. Here, the fact that more than 88% of all vehicles were initially allocated to dealers without regard to their accessory purchases belies any claim that SNE's conditioning practices threatened to deny dealers access to vehicles that they need to conduct viable business operations. [FN14] Thus, I reject plaintiffs' claim that the conditioning practices violated either the ADDCA or the state dealer acts.

FN14. Plaintiffs also allege that initial allocation vehicles were not distributed fairly. While I agree that, if proved, such conduct might well be unlawful, I am not convinced that those claims are amenable to class action treatment. Since much of the evidence is anecdotal and dealer or district manager specific, I treat those allegations as category II claims, and analyze them below.

### 2. Hobbs Act Claims

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.