# TAB 9(b)

The dealers identify three distinct RICO claims in their second amended complaint. In Count I they claim that SNE is liable because it conducted or participated in the conduct of an enterprise through a pattern of racketeering. *See* 18 U.S.C. § 1962(c) (2000). They charge in Counts II and III that Boch and Appelbe, respectively, are liable on the same theory. *See* 18 U.S.C. § 1962(c). All three claims are based on plaintiffs' assertion that the defendants violated the Hobbs Act by extorting the dealers through their option-packing scheme and committing various acts of mail and wire fraud to conceal the existence of the scheme. I deal here with plaintiffs' claim that SNE's conditioning practices qualify as extortion.

[8][9][10] The Hobbs Act imposes criminal penalties on any person who " in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion." 18 U.S.C. § 1951(a). The act defines extortion as " the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear." *Id.* at § 1951(b)(2). Fear of economic loss, generally called " economic fear," is included within the meaning of the statutory term " fear." *See, e.g., United States v. Hathaway,* 534 F.2d 386, 394 (1st Cir.1976). Not every business use of economic fear, however, is inherently unlawful. *See United States v. Sturm,* 870 F.2d 769, 773 (1st Cir.1989). " Indeed, the fear of economic loss is a driving force of our economy that plays an important role in many legitimate business transactions." *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.,* 140 F.3d 494, 523 (3rd Cir.1998). One court has distinguished between legitimate and illegitimate uses of economic fear by stating:

In a ' hard bargaining' scenario the alleged victim has no pre-existing right to pursue his business interests free of the fear he is quelling by receiving value in return for transferring property to the defendant, but in an extortion scenario the alleged victim has a pre-existing entitlement to pursue his business interests free of the fear he is quelling by receiving value in return for transferring property to the defendant.

*Id.* at 525 (quoting *Viacom Int'l, Inc. v. Icahn,* 747 F.Supp. 205, 213 (S.D.N.Y.1990), *aff'd on other grounds,* 946 F.2d 998 (2d Cir.1991)). I agree with this reasoning.

[11] As I have already noted, plaintiffs had no pre-existing right to either turndown or discretionary vehicles. Thus, SNE's alleged threat to withhold access to ***98** such vehicles unless a dealer agreed to purchase accessories does not give rise to the kind of economic fear that the Hobbs Act was designed to address. Accordingly, defendants are entitled to summary judgment to the extent that plaintiffs' RICO claims are based on the assertion that SNE's alleged conditioning practices qualify as extortion under the Hobbs Act.

### 3. Antitrust Claims

Plaintiffs argue that defendants violated Section 1 of the Sherman Act, 15 U.S.C. § 1 (1996), and Section 3 of the Clayton Act, 15 U.S.C. § 14 (1997), by illegally tying the sale of turndown and discretionary vehicles to the purchase of accessories for both these vehicles and regular allocation vehicles. To prove what they assert is a *per se* violation of the antitrust laws, plaintiffs must demonstrate that: (1) their claim concerns both a " tying" product, in this case, Subaru vehicles, and a distinct " tied" product, in this case, accessories; (2) SNE conditioned the sale of Subaru vehicles on the purchase of accessories; (3) SNE has sufficient market power in the relevant market for Subaru vehicles to appreciably restrain trade in the market for accessories; and (4) as a result, SNE was able to foreclose a not insubstantial amount of interstate commerce in the market for accessories. *See Borschow Hosp. and Med. Supplies, Inc. v. Cesar Castillo, Inc.,* 96 F.3d 10, 17 (1st Cir.1996); *ABA Antitrust Law Developments,* 179 (5th ed.2002) (setting forth elements of a *per se* tying claim).

Defendants challenge plaintiffs' tying claim by arguing that they cannot prove that SNE had market power in the relevant tying product market. They begin their argument by defining the relevant market as the New England market for new vehicles. They then cite the First Circuit's decision in *Grappone v. Subaru of New England, Inc.,* 858 F.2d 792, 797-98 (1st Cir.1988), for the proposition that SNE lacks market power in the new vehicle market. Plaintiffs respond by claiming that defendants have misidentified the relevant tying product market. Relying on the Supreme Court's decision in *Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992), they claim that the relevant market should be limited to the New England market for new Subaru vehicles because they have been " locked-in" to the purchase

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

of Subaru vehicles by their dealer agreements and the significant costs that they have incurred to establish their dealerships. They assert that SNE has market power in this more narrowly defined market because SNE is the exclusive distributor of new Subaru vehicles in New England.

As I explain in greater detail below, I reject plaintiffs' argument because it mistakenly confuses the contract power that SNE has acquired by virtue of its dealership agreements with the market power that SNE must possess before it can be held liable for a tying violation. To explain my thinking, I begin by describing the First Circuit's decision in *Grappone* and the Supreme Court's decision in *Kodak.* I then explain why *Kodak* does not apply in cases such as this where a distributor's power to require a dealer to purchase one product in order to obtain another arises from a contractual commitment, rather than market forces.

**a. *Grappone***

In *Grappone,* a Subaru dealer brought a tying claim against SNE alleging that it had conditioned vehicle allocation on the dealer's agreement to purchase spare parts. *See id.* at 793. In rejecting this claim, the court determined that the dealer had failed to show that " Subarus had any ***99** special or unique features, such as patents or copyrights, that might demonstrate market power." *Id.* at 798. The court also concluded that SNE lacked market power in the new vehicle market because, its market share in that market was " minuscule" and thus SNE lacked the power to raise prices for its vehicles above a competitive level. *Id.* at 797-98. The First Circuit accordingly concluded that the dealer had " failed to prove that the *per se* anti-tying rules apply in this case." *Id.* at 800.

**b. *Kodak***

In *Kodak,* which was decided several years after *Grappone,* the Supreme Court was presented with a case in which a manufacturer allegedly used market power in an aftermarket for unique replacement parts to compel purchasers of the replacements parts to also purchase maintenance and repair services from *Kodak.*

Kodak manufactured and sold photocopiers and micrographic equipment. *See Kodak,* 504 U.S. at 455, 456, 112 S.Ct. 2072. It also sold two aftermarket products related to its equipment: replacement parts and service. *See id.* at 455, 457, 112 S.Ct. 2072. After many customers had already purchased Kodak equipment, numerous independent service organizations (ISOs) began to offer service for Kodak's machines at a lower price than that charged by Kodak. *See id.* at 455, 457, 112 S.Ct. 2072. Kodak reacted by tying the availability of its replacement parts, which were the only parts that could be used in servicing its machines, to the purchase of service from Kodak. *See id.* at 457, 458, 112 S.Ct. 2072. As a result, the ISOs were no longer able to compete with Kodak in the market for equipment servicing. *See id.* at 458, 112 S.Ct. 2072.

A group of ISOs sued Kodak, claiming, *inter alia,* that Kodak had tied the sale of replacement parts to the purchase of maintenance and repair services, in violation of § 1 of the Sherman Act. *See id.* at 459, 112 S.Ct. 2072. In response, Kodak insisted that it was entitled to judgment as a matter of law because the existence of competition in the equipment market, which was conceded, necessarily meant that there must be competition in the derivative aftermarket for replacement parts. *See id.* at 465-66, 112 S.Ct. 2072. Therefore, Kodak argued, it lacked sufficient power in the market for replacement parts (the " tying product" ) to commit a *per se* tying violation. *See id.* Kodak's proposed legal rule-that " equipment competition precludes any finding of monopoly power in derivative aftermarkets," *id.* at 466, 112 S.Ct. 2072 (internal quotation marks omitted)-stemmed from an assumption about the perfect operation of the " cross-elasticity of demand" between the primary equipment market and the derivative aftermarkets. *Id.* at 469, 112 S.Ct. 2072 (internal quotation marks omitted).

The Court rejected Kodak's contention, concluding instead that " there is no immutable physical law-no ' basic economic reality'-insisting that competition in the equipment market cannot coexist with market power in the aftermarkets." *Id.* at 471, 112 S.Ct. 2072. Rather, the court held that the ISOs were entitled to the opportunity to prove that two factors-" information costs" and " switching costs" -" foil[ed] the simple assumption that the equipment and service markets act as pure complements to one another." *Id.* at 477, 112 S.Ct. 2072. The Court determined that information costs could undermine the " cross-elasticity of demand" between the equipment market and derivative aftermarkets if consumers who purchased Kodak equipment lacked the information necessary to calculate the total " life-cycle" cost of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the equipment, including the cost of ***100** tied parts and service, at the time that they decided which manufacturer's machines to purchase. *See id.* at 473-76, 112 S.Ct. 2072. The Court also reasoned that consumers who purchased Kodak equipment might be willing to pay supra-competitive prices for Kodak service in order to get the replacement parts they needed to maintain their original investment in the equipment, particularly if their only alternative was to switch to another manufacturer's machines and thereby abandon the substantial investment already made in the Kodak equipment. *See id.* at 476-77, 112 S.Ct. 2072.

[12] *Kodak* has spawned several judicial decisions which consider whether power acquired as a result of a contractual lock-in can be equated with the market power that is required to support a tying claim. Although not all courts and commentators agree, the prevailing view is that a contractual lock-in ordinarily does not give rise to concerns that the antitrust laws were enacted to address. *See, e.g., Maris Distrib. Co. v. Anheuser-Busch, Inc.,* 302 F.3d 1207, 1222 (11th Cir.2002); *Hack v. President and Fellows of Yale College,* 237 F.3d 81, 85 (2d Cir.2000); *Queen City Pizza, Inc. v. Domino's Pizza, Inc.,* 124 F.3d 430, 438 (3d Cir.1997); *United Farmers Agents Assoc., Inc. v. Farmers Ins. Exchange,* 89 F.3d 233, 236-37 (5th Cir.1996); Tony Lin, *Distinguishing Kodak Lock-in and Franchise Contractual Lock-in,* 28 S. Ill. U. L.J. 87 (1998); Alan H. Silberman, *The Myths of Franchise " Market Power "* , 65 Antitrust L.J. 181 (1996); *but see* Benjamin Kline, *Market Power in Franchise Cases in the Wake of Kodak: Applying Post-Contractual Hold-up Analysis to Vertical Relationships,* 67 Antitrust L.J. 283 (1999).

**c. *Application***

[13] Plaintiffs do not question the First Circuit's conclusion in *Grappone* that SNE lacks market power in the New England vehicle market. Nor do they take issue with the prevailing view that contract power ordinarily cannot, by itself, establish the market power necessary to support a tying claim. Nevertheless, they argue that the relevant tying product market in this case should be limited to the market for Subaru vehicles because SNE locked them in to their dealerships by misleading them into believing that accessories were optional.FN15 In other words, plaintiffs contend that power acquired through a contractual lock-in may substitute for market power if the lock-in was induced by misrepresentation. I reject this contention.

> FN15. Defendants dispute plaintiffs' claim that they were locked into the purchase of Subaru vehicles. To support their position, defendants note that Subaru dealers are free to own other dealerships; that they may terminate their dealerships at any time on 60-days notice; that SNE must purchase most inventory and Subaru specific tools when a distributorship is terminated; and that dealerships and the real estate investments that have been made by dealers to develop their dealerships are readily saleable. While this argument may well have merit, I nevertheless accept for purposes of analysis plaintiffs' contention that they were contractually locked into the purchase of Subaru vehicles.

A contractual lock-in of the type at issue here does not adversely affect either consumers or competitors in the absence of true market power, regardless of whether the lock-in was induced by misrepresentation or was the result of good faith negotiation. *See* Phillip E. Areeda, Herbert Hovenkamp & John L. Solow, *Antitrust Law* (2d ed.2002) ¶ 519 at 149-50. If, as plaintiffs concede was the case, the new vehicle market was competitive during the class period, SNE could not have induced consumers to pay inflated prices for Subarus simply because its dealers were contractually locked in to their dealerships. Nor ***101** could SNE have used its alleged power over vehicle allocation to foreclose a significant portion of an otherwise competitive market for accessories. While the dealers may have suffered if, as they claim, SNE fraudulently induced them to sign their dealer contracts and incur substantial costs in building their dealerships, the law of fraud, misrepresentation, and unfair competition exists to address such concerns. *See id.* at 149 (rejecting view that contractual lock-in claim is viable as a tying claim if " the lock-in occurs as a result of seller misrepresentation" ). In short, no purpose would be served in turning antitrust law into a substitute for this well-established body of state law. *See id.* Thus, I cannot permit plaintiffs to redefine the relevant market as the market for new Subaru vehicles merely because the dealers claim that SNE induced them to acquire their dealerships through a pattern of deception.

Because plaintiffs have failed to demonstrate that

SNE has appreciable market power in the relevant tying product market, their tying claim fails.

**4. Contract Claim**

[14] Plaintiffs assert that SNE's conditioning practices breached its contractual obligations to allocate vehicles " equitably" and to generally behave " in a lawful and ethical manner." Defendants respond by claiming its practices were not unlawful, unethical, or inequitable because (1) the practices do not violate state or federal law; (2) most vehicles were allocated using the allocation formula specified in Fair Share II; and (3) Fair Share II, which specified the manner in which SNE was required to implement its duty to allocate vehicles equitably, expressly authorized SNE to use discretionary vehicles for market actions such as encouraging incentive purchases and did not prohibit SNE from using turndown vehicles for the same purposes. Plaintiffs' only response to these arguments is to claim in a conclusory fashion that " [d]efendants illegal, coercive and deceptive conduct violates SNE's promises" to " allocate vehicles fairly and equitably" and to at all times behave in a " lawful and equitable manner." Pls.' Mem. at 75. This is not an acceptable response.

As I have already explained, SNE's conditioning practices did not violate the ADDCA, the state dealer acts, the Hobbs Act, or the federal antitrust laws. Moreover, its use of discretionary vehicles to encourage market actions such as the purchase of accessories was expressly authorized by Fair Share II, and its reservation of the right to allocate turndown vehicles to dealers of its choosing did not violate the dealer agreements because these vehicles had already passed through the agreed-upon allocation system. Finally, it is undisputed that more than 88% of all vehicles were initially allocated under Fair Share II using a formula that did not take into account whether a dealer had agreed to purchase accessories. Under these circumstances, I fail to see how SNE's conditioning practices were illegal, unethical, or inequitable.

**B. Second Category Claims**

[15] Plaintiffs' second category claims allege civil RICO violations arising from a pattern of mail and wire fraud. The alleged fraud scheme on which these claims are based was a scheme to conceal from dealers the existence of SNE's alleged option-packing scheme. As I explain below, these claims fail for the simple reason that plaintiffs have failed to demonstrate that they were injured as a result of the fraud scheme. *See* Bonilla v. Volvo Car Corp., 150 F.3d 62, 66 (1st Cir.1998); *see also* Sys. Mgmt., Inc. v. Loiselle, 303 F.3d 100, 104 (1st Cir.2002) (assuming that plaintiff ***102** must prove both " but for" and proximate causation to support a civil RICO claim based on mail fraud).

Plaintiffs assert that defendants' fraud scheme caused them three types of injuries: (1) costs incurred to purchase unwanted accessories; (2) costs incurred to pay floor plan interest for vehicles that took longer to sell because they were equipped with accessories; and (3) reductions in the value of their dealerships. Plaintiffs have failed to explain how the alleged fraud scheme could have contributed in any substantial way to any of these claimed injuries. Any added costs that plaintiffs may have incurred to purchase unwanted accessories or to pay floor plan interest on vehicles that took longer than expected to sell would have been directly caused by the option-packing scheme rather than the fraud scheme. The fraud scheme could only have substantially contributed to these injures if it caused dealers to lock themselves in their dealer contracts on the basis of a mistaken impression that the option-packing scheme had been discontinued. Plaintiffs have offered no evidence suggesting that any dealer signed a dealer contract or made a substantial investment in a dealership as a result of any of the allegedly fraudulent statements which give rise to their claims. Plaintiffs' assertion that the fraud scheme caused a diminution in the value of their dealerships fares no better because the expert witness that they have designated to testify on this issue states only that the dealerships decreased in value as a result of " the disparaging and litigious relationship of Subaru of New England and Mr. Boch," Pls.' Mem. at 66, rather than the fraud scheme.

Because plaintiffs have failed to show that they suffered any injury as a result of defendants' alleged fraud scheme, defendants are entitled to summary judgment with respect to plaintiffs' second category claims.

**C. *Third Category Claims***

When I certified this case for class action treatment, I devoted most of my attention to plaintiffs' first and second category claims. *See* George Lussier Enters., Inc. v. Subaru of New England, 2001 D.N.H. 143, at

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*18-*58, 2001 WL 920060 (2001). Because I have determined that these claims are no longer viable, it makes sense to reexamine my prior determination that class certification is warranted with respect to plaintiffs' third category claims.

### 1. Decertification Standard

[16] A class certification order may be " altered or amended," Fed.R.Civ.P. 23(c)(1), if " upon fuller development of the facts, the original determination appears unsound." *See id.* at adv. committee notes. Consequently, I am " required to reassess [my] class rulings as the case develops." *Barnes v. Am. Tobacco Co.,* 161 F.3d 127, 140 (3rd Cir.1998); *see also Lamphere v. Brown Univ.,* 553 F.2d 714, 719 (1st Cir.1977) (Rule 23(c)(1) " provides for reconsideration of the [certification] decision as the case progresses." ); *Boucher v. Syracuse Univ.,* 164 F.3d 113, 118 (2d Cir.1999). If it " appears that the requirements of Rule 23 are not in fact met" after the facts are developed and the case progresses, I may decertify the class. *Sirota v. Solitron Devices, Inc.,* 673 F.2d 566, 572 (2d Cir.1982).

I apply this standard in reviewing plaintiffs' third category claims.

### 2. Analysis

[17] Plaintiffs' third category claims consist of allegations that SNE's district managers used coercive means in addition to conditioning to compel dealers to purchase unwanted accessories. Unlike plaintiffs'***103** conditioning claims, these claims depend entirely upon anecdotal evidence that SNE's district managers employed allegedly unlawful pressure tactics such as altering the color mix of vehicles assigned to uncooperative dealers, refusing to fill sell orders placed by such dealers, and threatening dealers that they would suffer in unspecified ways if they did not purchase accessories.

Although this evidence may support viable claims that certain district managers engaged in unlawful conduct when selling accessories to particular dealers, it does not justify an inference that district managers' misconduct was widespread or that class members experienced the misconduct in similar ways. Under these circumstances, I do not see how I could determine the viability of any class member's category three claims in a single trial. Instead, determining whether the allegedly coercive means used by a district manager in any particular case were, in fact, unlawful will require a fact-intensive inquiry into each dealer's interaction with particular district managers. Class action treatment ordinarily is not warranted for such claims because any attempt to resolve them in a common trial will break down into a series of individualized mini-trials on issues that will substantially predominate over issues common to the class. *See Jackson v. Motel 6 Multipurpose, Inc.,* 130 F.3d 999, 1006 (1st Cir.1997).

Given my concern that plaintiffs' category three claims may not be appropriate for class action treatment, I see no point in attempting to resolve defendants' challenge to these claims at the present time. Instead, I deny defendants' summary judgment motion with respect to these claims without prejudice and direct plaintiffs to show cause on or before October 30, 2003 as to why I should not decertify the class with respect to these claims.

## III. *CONCLUSION*

For the reasons set forth in this Memorandum and Order, I deny plaintiffs' motion for summary judgment (doc. no. 381), grant defendants' motions for summary judgment (doc nos. 368, 369 and 370) with respect to plaintiffs' category one and two claims and deny their motions without prejudice with respect to plaintiffs' category three claims. I direct the plaintiffs to show cause on or before October 30, 2003 as to why I should not decertify the class with respect to plaintiffs' category three claims.

SO ORDERED.

D.N.H.,2003.
George Lussier Enterprises, Inc. v. Subaru of New England, Inc.
286 F.Supp.2d 86, 2003-2 Trade Cases P 74,180, RICO Bus.Disp.Guide 10,545, 2003 DNH 160

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**H**
George Lussier Enterprises, Inc. v. Subaru of New England, Inc.
C.A.1 (N.H.),2004.

United States Court of Appeals,First Circuit.
GEORGE LUSSIER ENTERPRISES, INC. d/b/a Lussier Subaru; Sullivan County Motors, Inc. d/b/A Subaru of Claremont; Camilleri Bros., Inc. d/b/a C & C Subaru; Bald Hill Realty, Inc. d/b/a Bald Hill Subaru; Kinney Motors, Ltd.; Reynolds Garage & Marine, Inc., Plaintiffs, Appellants,
v.
SUBARU OF NEW ENGLAND, INC.; Ernest J. Boch, Jr. and Joseph Appelbe, Defendants, Appellees.
**No. 03-2715.**

Heard June 10, 2004.
Decided Dec. 16, 2004.

**Background:** Automobile dealers brought action against distributor, alleging violations of Automobile Dealer Day in Court Act (ADDCA), various state dealer statutes, Racketeer Influenced and Corrupt Organizations Act (RICO), Sherman and Clayton antitrust acts, and dealer contracts. The United States District Court for the District of New Hampshire, Paul J. Barbadoro, Chief Judge, granted summary judgment for distributor, 286 F.Supp.2d 86. Dealers appealed.

**Holdings:** The Court of Appeals, Torruella, Circuit Judge, held that:

(1) distributor's practice of conditioning access to, or accessorizing, discretionary and turndown cars, which dealers

**Holdings:** The Court of Appeals, Torruella, Circuit Judge, held that:

(1) distributor's practice of conditioning access to, or accessorizing, discretionary and turndown cars, which dealers had no contractual right to receive, did not constitute " coercion" under ADDCA;

(2) distributor's practice of conditioning access to vehicles did not constitute " coercion" under state dealer acts;

(3) distributor did not " require" dealers under Connecticut dealer act to purchase unordered accessories by conditioning access to vehicles;

(4) distributor did not breach its contractual obligation to allocate vehicles " fairly and equitably" ;

(5) distributor's conditioning of access to vehicles did not amount " wrongful demand" to constitute component for coercion under Hobbs Act; and

(6) dealers were not injured as result of distributor's alleged fraudulent scheme to conceal alleged options-packing scheme.

Affirmed.
West Headnotes
**[1] Antitrust and Trade Regulation 29T 269(3)**

29T Antitrust and Trade Regulation
29TIII Statutory Unfair Trade Practices and Consumer Protection
29TIII(D) Particular Relationships
29Tk262 Franchises; Distributorships and Dealerships
29Tk269 Motor Vehicle Dealers
29Tk269(3) k. Practices Prohibited or Required in General. Most Cited Cases
(Formerly 382k871(2) Trade Regulation)
A court reads the requirements of the ADDCA very narrowly to require actual or threatened coercion or intimidation when interpreting the good faith provision. Automobile Dealers Day in Court Act, § 2, 15 U.S.C.A. § 1222.

**[2] Antitrust and Trade Regulation 29T 269(3)**

29T Antitrust and Trade Regulation
29TIII Statutory Unfair Trade Practices and Consumer Protection
29TIII(D) Particular Relationships
29Tk262 Franchises; Distributorships and Dealerships
29Tk269 Motor Vehicle Dealers

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

29Tk269(3) k. Practices Prohibited or Required in General. Most Cited Cases
(Formerly 382k871(2) Trade Regulation)
Under the ADDCA, lack of good faith does not simply mean malicious conduct or unfairness; lack of good faith must be found in the context of actual or threatened coercion or intimidation. Automobile Dealers Day in Court Act, § 2, 15 U.S.C.A. § 1222.

**[3] Antitrust and Trade Regulation 29T 269(3)**

29T Antitrust and Trade Regulation
29TIII Statutory Unfair Trade Practices and Consumer Protection
29TIII(D) Particular Relationships
29Tk262 Franchises; Distributorships and Dealerships
29Tk269 Motor Vehicle Dealers
29Tk269(3) k. Practices Prohibited or Required in General. Most Cited Cases
(Formerly 382k871(2) Trade Regulation)
Under the ADDCA, coercion must be actual; the mere fact that a dealer may have felt it had been coerced or intimidated is not sufficient. Automobile Dealers Day in Court Act, § 2, 15 U.S.C.A. § 1222.

**[4] Antitrust and Trade Regulation 29T 269(3)**

29T Antitrust and Trade Regulation
29TIII Statutory Unfair Trade Practices and Consumer Protection
29TIII(D) Particular Relationships
29Tk262 Franchises; Distributorships and Dealerships
29Tk269 Motor Vehicle Dealers
29Tk269(3) k. Practices Prohibited or Required in General. Most Cited Cases
(Formerly 382k871(2) Trade Regulation)
A manufacturer conditioning continuation of a franchise upon certain conduct, even if characterizable as a threat, cannot constitute forbidden coercion per se under the ADDCA; it must appear that the condition was unfair or inequitable. Automobile Dealers Day in Court Act, § 2, 15 U.S.C.A. § 1222.

**[5] Antitrust and Trade Regulation 29T 269(3)**

29T Antitrust and Trade Regulation
29TIII Statutory Unfair Trade Practices and Consumer Protection
29TIII(D) Particular Relationships
29Tk262 Franchises; Distributorships and Dealerships
29Tk269 Motor Vehicle Dealers
29Tk269(3) k. Practices Prohibited or Required in General. Most Cited Cases
(Formerly 382k871(2) Trade Regulation)
To state a cause of action under the ADDCA, the aggrieved dealer must produce evidence that the manufacturer or distributor: (1) made a wrongful demand, coupled with (2) sanctions, or threat thereof. Automobile Dealers Day in Court Act, § 2, 15 U.S.C.A. § 1222.

**[6] Antitrust and Trade Regulation 29T 269(3)**

29T Antitrust and Trade Regulation
29TIII Statutory Unfair Trade Practices and Consumer Protection
29TIII(D) Particular Relationships
29Tk262 Franchises; Distributorships and Dealerships
29Tk269 Motor Vehicle Dealers
29Tk269(3) k. Practices Prohibited or Required in General. Most Cited Cases
(Formerly 382k871(2) Trade Regulation)
Distributor's practice of conditioning access to, or accessorizing, discretionary and turndown cars, which dealers had no contractual right to receive, did not constitute " coercion" under ADDCA. Automobile Dealers Day in Court Act, § 2, 15 U.S.C.A. § 1222.

**[7] Federal Civil Procedure 170A 2485**

170A Federal Civil Procedure
170AXVII Judgment
170AXVII(C) Summary Judgment
170AXVII(C)2 Particular Cases
170Ak2485 k. Automobile Cases. Most Cited Cases
Summary judgment is proper under the ADDCA if a plaintiff dealer fails to offer evidence showing a wrongful demand and sanctions, and thus coercion, under the ADDCA's good-faith requirement. Automobile Dealers Day in Court Act, § 2, 15 U.S.C.A. § 1222; Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.

**[8] Antitrust and Trade Regulation 29T**

**269(3)**

29T Antitrust and Trade Regulation
29TIII Statutory Unfair Trade Practices and Consumer Protection
29TIII(D) Particular Relationships
29Tk262 Franchises; Distributorships and Dealerships
29Tk269 Motor Vehicle Dealers
29Tk269(3) k. Practices Prohibited or Required in General. Most Cited Cases
(Formerly 382k871(2) Trade Regulation)
A manufacturer's conditioning of access to vehicles beyond the regular allocation process, without more, does not amount to a " wrongful demand" that would constitute coercion under ADDCA's good-faith requirement; since dealers are not contractually entitled to these extra vehicles, a manufacturer's decision to impose reasonable conditions for dealer access is neither " wrongful" nor even a " demand." Automobile Dealers Day in Court Act, § 2, 15 U.S.C.A. § 1222.

**[9] Antitrust and Trade Regulation 29T 269(3)**

29T Antitrust and Trade Regulation
29TIII Statutory Unfair Trade Practices and Consumer Protection
29TIII(D) Particular Relationships
29Tk262 Franchises; Distributorships and Dealerships
29Tk269 Motor Vehicle Dealers
29Tk269(3) k. Practices Prohibited or Required in General. Most Cited Cases
(Formerly 382k871(2) Trade Regulation)
To state a claim under ADDCA, plaintiff dealers need not offer evidence that the contested practices threatened any dealer's ability to conduct successful business operations. Automobile Dealers Day in Court Act, § 2, 15 U.S.C.A. § 1222.

**[10] Antitrust and Trade Regulation 29T 269(3)**

29T Antitrust and Trade Regulation
29TIII Statutory Unfair Trade Practices and Consumer Protection
29TIII(D) Particular Relationships
29Tk262 Franchises; Distributorships and Dealerships
29Tk269 Motor Vehicle Dealers
29Tk269(3) k. Practices Prohibited or Required in General. Most Cited Cases
(Formerly 382k871(2) Trade Regulation)
Distributor's practice of conditioning access to, or accessorizing, discretionary and turndown cars, which dealers had no contractual right to receive, did not constitute " coercion" under state dealer acts. RSA 357-C:3; 10 M.R.S.A. § 1174; Gen.Laws 1956, § 31-5.1-4(b); M.G.L.A. c. 93B, § 4(2)(b); 9 V.S.A. § 4096.

**[11] Federal Civil Procedure 170A 165**

170A Federal Civil Procedure
170AII Parties
170AII(D) Class Actions
170AII(D)1 In General
170Ak165 k. Common Interest in Subject Matter, Questions and Relief; Damages Issues. Most Cited Cases
Automobile dealers' argument, that " coercion" held different meanings under different state dealer statutes, negated presence of " common questions of law" necessary for class certification, in dealers lawsuit against distributor. Fed.Rules Civ.Proc.Rule 25(a), 28 U.S.C.A.; RSA 357-C:3; 10 M.R.S.A. § 1174; R.I.Gen.Laws 1956, § 31-5.1-4(b); M.G.L.A. c. 93B, § 4(2)(b); 9 V.S.A. § 4096.

**[12] Antitrust and Trade Regulation 29T 269(3)**

29T Antitrust and Trade Regulation
29TIII Statutory Unfair Trade Practices and Consumer Protection
29TIII(D) Particular Relationships
29Tk262 Franchises; Distributorships and Dealerships
29Tk269 Motor Vehicle Dealers
29Tk269(3) k. Practices Prohibited or Required in General. Most Cited Cases
(Formerly 382k871(2) Trade Regulation)
Distributor did not " require" dealers under Connecticut dealer act to purchase unordered accessories by conditioning access to, or accessorizing, discretionary and turndown cars, since dealers had no requirement to purchase any cars beyond regular allocation process. C.G.S.A. § 42-133bb.

**[13] Contracts 95 312(1)**

95 Contracts
95V Performance or Breach

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

95k312 Acts or Omissions Constituting Breach in General

95k312(1) k. In General. Most Cited Cases

Automobile distributor did not breach its contractual obligation to allocate vehicles " fairly and equitably" when it conditioned its allocation of " discretionary" vehicles on dealers' purchase of accessories, although distributor failed to state its conditioning practice in contract; failure to state practice was insufficient to find breach of contractual duty, contract did not forbid accessorization of discretionary cars, dealers initially received 88% of all cars distributed which supported finding of " fair and equitable" allocation, and all dealers had to purchase accessorized discretionary cars if they wanted access to such cars which supported finding of " equitable" allocation.

**[14] Federal Courts 170B 874**

170B Federal Courts
170BVIII Courts of Appeals
170BVIII(K) Scope, Standards, and Extent
170BVIII(K)5 Questions of Fact, Verdicts and Findings
170Bk870 Particular Issues and Questions
170Bk874 k. Contracts, Damages and Relief. Most Cited Cases

Findings relating to disputes of fact over the construction of contract terms are subject to deference on review.

**[15] Contracts 95 312(1)**

95 Contracts
95V Performance or Breach
95k312 Acts or Omissions Constituting Breach in General
95k312(1) k. In General. Most Cited Cases

Automobile distributor did not breach its contractual obligation to allocate vehicles " fairly and equitably" when it conditioned its allocation of " turndown" vehicles on dealers' purchase of accessories, although distributor failed to state its conditioning practice in contract; distributor's failure to have written policy on turndown cars, without more, did not render its allocation system unfair or inequitable, dealers received all that they were entitled to receive under regular allocation process, and turndown cars had already passed through agreed-upon regular allocation process.

**[16] Contracts 95 312(1)**

95 Contracts
95V Performance or Breach
95k312 Acts or Omissions Constituting Breach in General
95k312(1) k. In General. Most Cited Cases

Distributor did not breach its contracts with dealers by using discretionary cars to encourage purchase of accessories in regular allocation cars, since more than 88% of all vehicles were initially allocated under agreement using formula that did not take into account whether dealer had agreed to purchase accessories.

**[17] Extortion and Threats 165 25.1**

165 Extortion and Threats
165II Threats
165k25 Nature and Elements of Offenses
165k25.1 k. In General. Most Cited Cases

Distributor's conditioning of access to vehicles, which were either initially withheld from initial allocation process or rejected by dealers, unless dealer agreed to purchase accessories, did not amount " wrongful demand" to constitute component for coercion under Hobbs Act; practice represented lawful hard-bargaining, not unlawful extortion, since dealers did not have pre-existing entitlement to those cars. 18 U.S.C.A. § 1951.

**[18] Extortion and Threats 165 25.1**

165 Extortion and Threats
165II Threats
165k25 Nature and Elements of Offenses
165k25.1 k. In General. Most Cited Cases

Although " fear" under the Hobbs Act may include economic fear, there is nothing inherently wrongful about the use of economic fear to obtain property; indeed, the fear of economic loss is a driving force of the economy that plays an important role in many legitimate business transactions. 18 U.S.C.A. § 1951.

**[19] Extortion and Threats 165 25.1**

165 Extortion and Threats
165II Threats
165k25 Nature and Elements of Offenses
165k25.1 k. In General. Most Cited Cases

Economic fear is wrongful under the Hobbs Act if the plaintiff had a pre-existing statutory right to be free from the defendant's demand. 18 U.S.C.A. § 1951.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**[20] Contracts 95 202(1)**

95 Contracts
95II Construction and Operation
95II(C) Subject-Matter
95k202 Trade and Business
95k202(1) k. In General. Most Cited Cases

Dealers did not have " collective" right or entitlement to receive all vehicles delivered by manufacturer for distribution through system, for purpose of contractual claim that distributor wrongfully conditioned purchase of discretionary or turndown cars on purchase of additional accessories, since each dealer had separate contract with distributor.

**[21] Racketeer Influenced and Corrupt Organizations 319H 62**

319H Racketeer Influenced and Corrupt Organizations
319HI Federal Regulation
319HI(B) Civil Remedies and Proceedings
319Hk56 Persons Entitled to Sue or Recover
319Hk62 k. Causal Relationship; Direct or Indirect Injury. Most Cited Cases

Costs associated with automobile dealers' purchase of unwanted accessories on vehicles, paying floor plan interests on vehicles that took longer than expected to sell, and reduction of value of their dealerships were indirect and derivative injuries, that were insufficient to support their civil Racketeer Influenced and Corrupt Organizations Act (RICO) claim, which was based on distributor's alleged fraudulent scheme to conceal alleged options-packing scheme. 18 U.S.C.A. § 1964.

**[22] Racketeer Influenced and Corrupt Organizations 319H 62**

319H Racketeer Influenced and Corrupt Organizations
319HI Federal Regulation
319HI(B) Civil Remedies and Proceedings
319Hk56 Persons Entitled to Sue or Recover
319Hk62 k. Causal Relationship; Direct or Indirect Injury. Most Cited Cases

To have standing in a civil Racketeer Influenced and Corrupt Organizations Act (RICO) claim, plaintiffs must show some direct relation between the injury asserted and the injurious conduct alleged. 18 U.S.C.A. § 1961 et seq.

**[23] Racketeer Influenced and Corrupt Organizations 319H 62**

319H Racketeer Influenced and Corrupt Organizations
319HI Federal Regulation
319HI(B) Civil Remedies and Proceedings
319Hk56 Persons Entitled to Sue or Recover
319Hk62 k. Causal Relationship; Direct or Indirect Injury. Most Cited Cases

" Proximate cause" required for a plaintiff to recover under the treble damages provision of the Racketeer Influenced and Corrupt Organizations Act (RICO) requires direct relation between conduct alleged and injury asserted; plaintiffs may not succeed by merely proving that the predicate acts were a " cause in fact" of the plaintiffs' injuries. 18 U.S.C.A. § 1964(c).

**[24] Racketeer Influenced and Corrupt Organizations 319H 47**

319H Racketeer Influenced and Corrupt Organizations
319HI Federal Regulation
319HI(A) In General
319Hk33 Enterprise
319Hk47 k. Professional, Business, or Trade Associations. Most Cited Cases

Network which presented automobile dealer concerns to distributor through its advisory board did not constitute " enterprise" under Racketeer Influenced and Corrupt Organizations Act (RICO), since distributor did not gain additional power to commit predicate racketeering acts through alleged mail and wire fraud by " taking over" network, using network as vehicle for racketeering, or corrupting otherwise lawful enterprise. 18 U.S.C.A. §§ 1341, 1343, 1961 et seq.

***40** Richard B. McNamara, with whom Gregory A. Holmes, Stephanie A. Bray, Elizabeth M. Leonard and Wiggin & Nourie, P.A. were on brief, for appellants.
Donald R. Frederico, with whom Steven W. Kasten and McDermott, Will & Emery were on brief, for Ernest J. Boch and Subaru of New England, Inc.
Howard Cooper, with whom Nicholas Carter and Todd & Weld LLP were on brief, for Subaru of New England, Inc.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Ronald L. Snow, with whom Lisa S. Wade and Orr & Reno P.A. were on brief, for Joseph A. Appelbe.
Paul R. Norman, with whom Catherine L. Cetrangolo and Boardman, Suhr, Curry & Field LLP were on brief, for amicus curiae National Automobile Dealers Association.

Before TORRUELLA, Circuit Judge, ROSENN,FN* Senior Circuit Judge, and HOWARD, Circuit Judge.

FN* Of the Third Circuit, sitting by designation.

TORRUELLA, Circuit Judge.
Various New England Subaru dealers (" Dealers" ) appeal the summary judgment entered in favor of their distributor, Subaru of New England, Inc. (" SNE" ), its sole shareholder and President, the late Ernest Boch, and its General Manager, Joseph Appelbe, in a class action commenced on March 5, 1999. Dealers assert that SNE controlled the vehicle allocation process to coerce them into purchasing unwanted accessories, and stated claims under the Federal Automobile Dealers' Day in Court Act (" ADDCA" ), state dealer statutes, state contract law, the *Sherman* and *Clayton* Antitrust Acts, and the Racketeer Influenced Corrupt Organization Act (" RICO" ). All claims were dismissed after discovery, and after careful review, we affirm.

## I. *Background*

SNE is the exclusive New England distributor of Subaru products. Since 1971, it has contracted with Subaru of America, Inc. (" SOA" ) to purchase a designated number of vehicles and to use its best efforts to promote and sell Subaru vehicles and accessories through sales representatives. SNE does not have the contractual right to sell vehicles to the public; rather, its distributorship agreement limits its activities to promoting the sale of Subaru products through the solicitation of and contracting with dealers.

SNE's contract with Subaru dealers incorporates SOA's " Standard Provisions." It requires the " Dealer to order and purchase Cars, subject to availability, in adequate quantities and on a regular periodic basis in order for Dealer to achieve adequate sales performance." Although the agreement does not require SNE to sell all of the cars to its dealers, it requires SNE to " allocate all Subaru products equitably, using appropriate factors such as the respective inventory levels and sales performance of Distributor's dealers during a representative period of time immediately prior to such allocation."

### A. *The Allocation System*

From February 1, 1987 until early 2001, SNE implemented the allocation provision under " Fair Share II."

***41** Fair Share II established the number of regular allocation cars that each dealer was entitled to receive under fixed and variable components. The fixed component was based on the higher of a dealership's planned sales volume or its average actual sales three years prior to Fair Share II. The variable component was based on a dealer's rate of sales over time. Essentially, the more cars the dealers sold, the more cars they would earn in future allocations. Regular allocation vehicles comprised 88.5% of all vehicles sold to dealers during the class period.

Not every car that SNE buys from SOA, however, is distributed immediately to the dealers. SNE engages in the industry practice[FN1] of retaining a certain percentage of cars for discretionary purposes. Fair Share II authorized SNE to withhold 10% of each vehicle shipment as " discretionary vehicles," which was later revised to 15% of Legacy models and 10% of all other models. Fair Share II further states that SNE will use these discretionary vehicles for demonstration, major auto shows, assistance to dealers, and VIPs. Discretionary vehicles comprised 11.5% of all vehicles sold to dealers during the class period.

FN1. The Massachusetts legislature, for example, recently endorsed this practice by amending its state dealer statute to allow manufacturers and distributors to withhold up to fifteen percent of cars and distribute them " for any business purpose that the manufacturer or distributor considers appropriate." Mass. Gen. Laws ch. 93B, § 4(c)(1)(i-ii)(2002). *See also* *Coady Corp. v. Toyota Motor Distrib., Inc.*, 361 F.3d 50, 56 (1st Cir.2004)(10% of cars and 15% of trucks retained from regular allocation); *Cabriolet Porsche Audi, Inc. v. Am. Honda Motor Co., Inc.*, 773 F.2d 1193 (11th Cir.1985)(15% of cars retained in discretionary pool); *Colonial Dodge, Inc. v. Chrysler Corp.*, 11 F.Supp.2d 737

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(D.Md.1996)(10% of cars retained in discretionary pool).

Meanwhile, the regular allocation vehicles rejected by dealers are referred to as " turndown vehicles." Fair Share II did not specify how turndown vehicles should be reallocated; SNE sold them to other dealers in their districts. Any turndown vehicle that remained unsold at the end of the month became subject to the next monthly allocation.

Finally, initial allocation and " package models" vehicles comprised 1.5% of all cars distributed during the class period. Initial allocation vehicles are distributed in the first monthly allocation of each new model year and are preaccessorized for dealers to display in the showroom. Special package models are cars that SNE accessorized to create new models; they are sometimes built from the discretionary pool.

**B.** ***Conditioning and Concealment of Accessories***

Dealers allege that during the class period-from January 1995 to August 2001-SNE " hit upon a scheme to maximize its profits" by pre-installing accessories before vehicle distribution. SNE installed more than $53 million worth of accessories during the class period, resulting in an average charge of $427 per vehicle. To encourage such sales, SNE paid its district managers commissions on the sale of these accessories, which amounted to between 40% to 60% of the managers' total compensation. SNE did not pay these commissions unless the district managers' average gross profit on such sales met a prescribed target of $140, requiring about $475 in accessory sales per vehicle. SNE further encouraged the sale of overstocked accessories by providing district managers with " focus letters" identifying such accessories.

Dealers assert that SNE conditioned access to discretionary and turndown cars by coercing dealers to purchase accessories in regular allocation cars. As evidence, dealers present an expert analysis establishing ***42** " a strong and statistically significant relationship between the volume of accessories purchased by Dealers and the number of discretionary and turndown cars they subsequently purchased." Dealers also present anecdotal evidence from dealers and former SNE employees alleging that SNE (1) conditioned access to discretionary and turndown cars on a dealer's assent to purchase accessories for regular allocations cars, and (2) used techniques such as tampering with the computer-based allocations, altering the color and model mix of cars assigned to particular dealers, and refusing to fill " sold orders" from dealers who did not purchase enough accessories.

Dealers also assert that SNE fraudulently concealed its conditioning practice. As evidence, dealers offer letters sent by Appelbe and another SNE employee stating that " accessories are strictly optional! You do not have to purchase any accessories on any Subaru you purchase from SNE." Moreover, SNE told dealers at an advisory meeting on October 23, 1996 that " no vehicles will be pre-accessorized in the future with the exception of Safari and Rally [models]." An SNE representative also stated in a letter to a dealer that " you are always entitled to purchase vehicles with or without port installed accessories."

Dealers filed suit under the ADDCA, state dealer acts, RICO, the *Sherman* and *Clayton* antitrust acts, and state contract law, arguing that SNE coerced them into purchasing unwanted accessories and fraudulently concealed this practice. Both dealers and SNE submitted dueling summary judgment motions. On September 26, 2003, the district court denied dealers' summary judgment motion and granted SNE's summary judgment motion on the ADDCA, state dealer statutes, antitrust acts, RICO, and state contract law claims.[FN2] Specifically, the court held, *inter alia,* that " SNE's conditioning practices do not violate the ADDCA or the state dealer acts and will not support a RICO extortion claim because they are not coercive; they do not violate the antitrust laws because SNE lacks market power in the relevant tying product market; and they do not breach SNE's dealer agreements because they are not unlawful, unethical, or inequitable." *George Lussier,* 286 F.Supp.2d at 93. Dealers appeal the ADDCA, state dealer law, state contract law, and RICO [FN3] claims.

FN2. The court, however, denied without prejudice SNE's summary judgment motion on dealer's claim that SNE used other coercive means to induce dealers to purchase accessories. The court reasoned that these claims are subsidiary to the conditioning claim, and " may not warrant class action treatment because common questions do not predominate and a class action would not be superior to other forms of adjudication." *George Lussier Enters.,*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Inc. v. Subaru of New England, Inc.,* 286 F.Supp.2d 86, 93 (D.N.H.2003).

FN3. The RICO claim includes coercion, mail and wire fraud, and substitution of defendants.

We now review each issue *de novo, see, e.g., Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.,* 373 F.3d 57, 60 (1st (summary judgment motions reviewed de novo), " reviewing the entire record in the light most hospitable to the party opposing summary judgment" -the Dealers. *Euromotion, Inc. v. BMW of North America, Inc.,* 136 F.3d 866, 869 (1st Cir.1998) (citations omitted).

**II.** ***Analysis***

**A.** ***The ADDCA***

The ADDCA provides automobile dealers with a federal cause of action against automobile manufacturers who fail " to act in *good faith* in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or ***43** not renewing the franchise with said dealer...." 15 U.S.C. § 1222 (1998)(emphasis added). The Act defines " good faith" as

the duty ... to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party: *Provided,* That recommendation, endorsement, exposition, persuasion, urging or argument shall not be deemed to constitute a lack of good faith.

15 U.S.C. § 1221(e).

[1][2][3][4] In interpreting ADDCA's good faith provision, " [t]his court has read the requirements of the ADDCA very narrowly to require ' actual or threatened *coercion* or intimidation.' " *General GMC, Inc. v. Volvo White Truck Corp., et al.,* 918 F.2d 306, 308 (1st Cir.1990)(quoting *H.D. Corp. of Puerto Rico v. Ford Motor Co.,* 791 F.2d 987, 990 (1st Cir.1986))(emphasis added). Lack of " good faith" does not simply mean malicious conduct or unfairness; " it must be found in the context of actual or threatened coercion or intimidation." *H.D. Corp.,* 791 F.2d at 990. Coercion " must be actual; the mere fact that a dealer may have felt it had been coerced or intimidated is not sufficient." *Id.* For example, a manufacturer " condition[ing] continuation of a franchise upon certain conduct, even if characterizable as a threat, cannot constitute forbidden coercion per se. It must appear that the condition was unfair or inequitable." *Volkswagen Interamericana, S.A. v. Rohlsen,* 360 F.2d 437, 442 (1st Cir.1966).

[5] This Court has held, and we again emphasize, that " coercion or intimidation [under the ADDCA] must include a wrongful demand that would result in penalties or sanctions if not complied with." *Wallace Motor Sales, Inc. v. Am. Motors Sales Corp.,* 780 F.2d 1049, 1059 (1st Cir.1985)(agreeing with several other circuits that " coercion or intimidation must include a wrongful demand which will result in sanctions if met." ). That is, to state a cause of action under the ADDCA, the aggrieved dealer must produce evidence that the manufacturer or distributor[FN4] (1) made a wrongful demand, coupled with (2) sanctions, or threat thereof. *Id.* at 1056. Otherwise, summary judgment is warranted if the dealer " has produced no evidence showing that it was subjected to coercion or intimidation" by the manufacturer or distributor. *General GMC,* 918 F.2d at 308.

FN4. " It is entirely consistent with both the purpose and language of the act to hold that ' automobile manufacturer' means, inter alia, ' automobile distributor,' when the distributor is subject to the manufacturer's control." *Rohlsen,* 360 F.2d at 441.

[6] In the instant case, appellants argue that SNE's pre-accessorization practice amounts to coercion and thus violates ADDCA's good-faith requirement because it solely benefits SNE at the expense of dealers. Appellants present three key pieces of evidence to show coercion: (1) expert testimony establishing a " strong and statistically significant relationship between the volume of accessories purchased by Dealers and the number of discretionary and turndown cars they subsequently purchased" ; (2) anecdotal evidence from dealers and former SNE employees alleging that SNE conditioned access to turndown and discretionary cars based on dealers' assent to purchase accessories for regular allocation cars; and (3) data indicating the disparity in price of average accessories between turndown, discretionary, and initial and special model vehicles ($490, $742, $1,360, respectively) versus regular allocation vehicles ($338). This proffered evidence ostensibly demonstrates that SNE "

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

coerced" appellant dealers***44** to buy accessories in regular allocation cars to gain access to discretionary and turndown cars, and that SNE installed leftover and " unwanted" accessories in turndown and discretionary cars. SNE's " coercive" practice, appellants argue, confers sole benefit to SNE to the sole detriment of the dealers, who allegedly are unable to pass the cost increases to consumers and must wait longer to sell these highly accessorized cars.

Viewing the evidence in the light most favorable to appellants, we find that SNE's conduct does not amount to coercion within the meaning of ADDCA. We simply fail to see how SNE's practice of conditioning access to, or accessorizing, discretionary and turndown cars-cars which dealers concede they had no contractual right to receive-constitutes coercion.

Several courts have found no coercion for various conditions imposed by distributors for dealers' access to vehicles which they were not entitled to receive. In *Cabriolet Porsche Audi, Inc. v. Am. Honda Motor Co., Inc.*, 773 F.2d 1193, 1209-11 (11th Cir.1985), for example, the Eleventh Circuit held that a distributor's offer of extra cars beyond the regular allocation process, in return for establishing an exclusive facility, does not amount to coercion in violation of ADDCA. 773 F.2d at 1209-11. The court stated that " [w]e have little doubt that had [the distributor] threatened to deny [the dealer] all cars, or any cars to which it was *entitled,* unless [the dealer] provided an exclusive facility, this would be evidence of coercion." *Id.* at 1210 (emphasis added). The distributor did not make a wrongful demand because it " did not threaten to take away, and did not take away, cars to which [the dealer] was entitled under the allocation system." *Id.* A manufacturer's or distributor's suggestions of ways to obtain extra cars-more cars than a dealer is entitled to receive under the regular allocation system-does not amount to coercion in violation of ADDCA. *Id.*

Similarly, in *Colonial Dodge, Inc. v. Chrysler Corp.*, 11 F.Supp.2d 737, 744-46 (D.Md.1996), *aff'd,* 121 F.3d 697 (4th Cir.1997), a district court granted summary judgment for the manufacturer because its requirement that dealers accept hard-to-sell automobiles as a precondition to receiving excess, fast-selling automobiles did not amount to coercion under the ADDCA. As evidence, the dealers offered affidavits indicating that the manufacturer refused to supply high-end vehicles beyond what was allocated under the " turn and earn" method unless the dealers agreed to order additional low-demand models. *Id.* at 746. The court held that since dealers offered no evidence that the manufacturer was required under any existing agreement to provide these extra vehicles, or that the manufacturer threatened to cut back on their supply of other vehicles if dealers did not order additional vehicles beyond the " turn and earn" system, dealers " cannot demonstrate coercion within the meaning of the statute." *Id.* Thus, the court granted summary judgment for the manufacturer because dealers failed to establish any genuine dispute of material fact under the ADDCA. *Id.*

[7][8] We find these cases persuasive, and thus hold that a manufacturer's conditioning of access to vehicles beyond the regular allocation process, without more, does not amount to a " wrongful demand" that would constitute coercion under ADDCA's good-faith requirement. Since dealers are not contractually entitled to these extra vehicles, a manufacturer's decision to impose reasonable conditions for dealer access is neither " wrongful" nor even a " demand." These conditions are not wrongful because they are part of a bargained-for exchange (e.g., accessories for extra cars, ***45** taking less-desirable cars to access discretionary highly desirable cars); neither do these conditions constitute a " demand" because dealers need not take these extra cars. Rather, these conditions constitute reasonable business judgments in a free market economy, and " [a] distributor acting honestly is entitled to latitude in making commercial judgments." *Coady Corp. v. Toyota Motor Distrib., Inc.*, 361 F.3d 50, 56 (1st Cir.2004). Summary judgment is therefore proper if a plaintiff dealer fails to offer evidence showing a wrongful demand and sanctions, and thus coercion, under the ADDCA's good-faith requirement.

Here, since dealers concede that they had no contractual right to receive either turndown or discretionary vehicles,[FN5] this ends our inquiry. Dealers' proffered evidence, even if taken to be true, merely establishes that (1) SNE conditioned access to turndown and discretionary cars based on dealers' assent to purchase accessories for regular allocation cars, and (2) SNE installed unwanted leftover accessories on the turndown and discretionary cars. However, since dealers offer no evidence indicating that SNE made wrongful demands to access vehicles

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that dealers were contractually entitled to receive, the district court properly granted summary judgment for SNE.

FN5. In response to SNE's Motion to Dismiss, dealers state that they " do not allege or in any way presume that they are contractually entitled to a certain percentage of discretionary cars."

Appellants nonetheless urge us to follow language from our decision in Volkswagen Interamericana, S.A. v. Rohlsen, 360 F.2d 437, 442 (1st Cir.1966) to define " good faith" under ADDCA. In *Rohlsen,* we held that the distributor's termination of a dealer's franchise related to the conduct of a dealer's agency, or the dealer's rejection of the distributor as partner on unreasonable terms, was a jury question. *Id.* at 444. *Rohlsen* states, in relevant part, that " we think there is an important difference between two kinds of improper conditions that a manufacturer might impose and back up by threats." *Id.* at 442. " Particularly suspect under the act are conditions which benefit only, or primarily, the manufacturer ... as distinguished from requirements that would tend to work to the mutual advantage of both parties." *Id.* Appellants allege that under this test, SNE's pre-accessorization practice only benefits SNE, and thus violates SNE's good-faith requirement.

We reject appellants' reading on two grounds. First, appellants' proffered " test" is mere dicta; we merely explored two possible scenarios for a condition to constitute coercion under ADDCA's good-faith requirement. We never announced a test for coercion, and thus good faith, in *Rohlsen. See* Wallace, 780 F.2d at 1056 (" This is the first time the meaning of this provision [' good faith' in 15 U.S.C. § 1221(e)] has come up for review in this circuit." ). Rather, we have now clarified that good faith under ADDCA requires a showing of (1) *wrongful conduct* coupled with (2) *sanctions,* or threat thereof. *See also* id. at 1059. And as we have explained, appellants fail to state a claim under this test. Second, even under the alleged " *Rohlsen* test," appellants fail to show that SNE's pre-accessorization practice lacks mutual benefit. Appellant dealers gained the additional benefit of cars that they were not otherwise entitled to receive and the additional profits that could be gained therefrom.

[9] Finally, although we agree with appellants and amicus that the district court erred in instituting a " ' brand new' viability*46 test," summary judgment is nonetheless warranted under the coercion test. Contrary to the district court's analysis, plaintiff dealers need not offer evidence that the contested " practices threatened any dealer's ability to conduct successful business operations" to state a claim under ADDCA. Such requirement is too narrow. It is enough that dealers offer evidence that the manufacturer or distributor made a wrongful demand coupled with threats of sanctions, such as withholding vehicles that dealers are legally entitled to receive. The district court's error, however, does not change the propriety of summary judgment in the instant case. *See, e.g.,* Torres v. E.I. Dupont De Nemours & Co., 219 F.3d 13, 17 (1st Cir.2000) (citations omitted) (" We may ... uphold the district court's order granting summary judgment regardless of whether we reject or adopt its rationale, so long as an ' independently sufficient ground' is made manifest by the record." ).

Thus, we affirm the district court's judgment on the ADDCA claim.

**B. *State Dealer Acts***

[10] In addition to the ADDCA claim, appellants allege that the state statutory counterparts to the ADDCA prohibit SNE's conduct. Appellants argue that contrary to the district court's holding, these state dealer statutes define coercion more broadly than the ADDCA and, consequently, cover the type of conduct engaged in by SNE. We disagree.

Each of the six states where SNE operates have enacted statutory counterparts to the ADCCA. Massachusetts[FN6] makes it unlawful to " coerce," Rhode Island,[FN7] Maine,[FN8] and New HampshireFN9 make it unlawful to " coerce or attempt to coerce," Vermont[FN10] makes it unlawful to " require or coerce," and ConnecticutFN11 makes it unlawful to " require," dealers to buy, order, or accept accessories that they have not voluntarily ordered. Of these, only the New Hampshire statute defines " coercion," which adopts language analogous to the ADDCA.[FN12]

FN6. The Massachusetts state dealer act makes it unlawful for a manufacturer or distributor to " coerce" a dealer to " accept or buy any ... accessory ... which has not been ordered or requested by the motor

vehicle dealer." Mass. Gen. Laws Ann. ch. 93B, § 4(2)(b) (1997 & Supp.2003).

FN7. The Rhode Island state dealer act makes it unlawful for a manufacturer to " coerce, or attempt to coerce," a dealer " to order or accept ... accessories ... which the motor vehicle dealer has not voluntarily ordered." R.I. Gen. Laws § 31-5.1-4(b) (2002).

FN8. The Maine state dealer statute makes it unlawful for a manufacturer or distributor to " coerce or attempt to coerce" a dealer to " order or accept delivery of ... accessories ... which such motor vehicle dealer has not voluntarily ordered." Me.Rev.Stat. Ann. tit. 10, § 1174(2) (1997 & Supp.2002).

FN9. The New Hampshire state dealer statute makes it unlawful for a manufacturer " to coerce or attempt to coerce" a dealer to " [o]rder or accept delivery of ... accessories ... which such motor vehicle dealer has not voluntarily ordered." N.H.Rev.Stat. Ann. § 357-C:3 (1995 & Supp.2002).

FN10. The Vermont state dealer statute makes it unlawful for a manufacturer to " require or to coerce" a dealer to " order or accept delivery of any ... accessory ... which shall not have been voluntarily ordered" by the dealer. Vt. Stat. Ann. tit. 9, § 4096 (2002).

FN11. The Connecticut state dealer statute makes it unlawful for a manufacturer or distributor to " require" a dealer to " [o]rder or accept delivery of any ... accessory ... not ... voluntarily ordered by the dealer." Conn. Gen.Stat. Ann. § 42-133bb (2003).

FN12. New Hampshire defines " coerc[ion]" as the " the failure to act in a fair and equitable manner in performing or complying with any terms or provisions of a franchise or agreement; provided, however, that recommendation, persuasion, urging or argument shall not be synonymous with ' coerce' or lack of ' good faith' ." N.H.Rev.Stat. Ann. § 357-C:3 (1995 & Supp.2002).

*47 Appellants argue that the state dealer statutes' prohibitions against coercing dealers into purchasing unordered accessories extend beyond " coercion" as understood under the ADDCA. Appellants cite a First Circuit decision where we stated that in construing the Massachusetts dealer act, " [b]ad faith may encompass broader conduct under Chapter 93B than mere coercion or intimidation." *General GMC*, 918 F.2d at 309 (citing *Tober Foreign Motors, Inc. v. Reiter Oldsmobile, Inc.*, 376 Mass. 313, 319-20, 381 N.E.2d 908 (1978)). This precedent, along with the statutes' legislative history, ostensibly demonstrate a legislative intent to eliminate the dealer's burden of showing wrongful conduct and threat of sanctions to state a claim under the state dealer acts.

Although more compelling than the ADDCA claim, we find appellants' argument unpersuasive. First, appellants' reliance on *General GMC* is misplaced. In *General GMC*, we held that although summary judgment was proper as to the ADDCA claim because the dealer produced no evidence of coercion, summary judgment was improper as to the state dealer claim because genuine issues of material fact existed as to whether the manufacturer acted in bad faith in terminating the dealer's franchise. 918 F.2d at 308-09. We reasoned that because Chapter 93B-the Massachusetts counterpart to the ADDCA-does not define " bad faith" or " good cause," a court is not bound by the same restrictions that exist under ADDCA: " [b]ad faith may encompass broader conduct than mere coercion or intimidation." *Id.* at 308. Our holding, however, interpreted Section 4(1) of 93B, which prohibits manufacturers from acting in " bad faith," and Section 4(3)(e), which prohibits manufacturers from canceling or terminating a franchise " without good cause." The issue here pertains to a different section-Section 4(2)-which prohibits " coercion," specifically, the manufacturer's coercion of dealers into purchasing accessories. Therefore, we do not read *General GMC* to mean that " coercion" under the state dealer statutes automatically encompasses conduct beyond its meaning under ADDCA.

To the contrary, courts have consistently held that " coercion" under state dealer statutes holds the same meaning as under the ADDCA. *See, e.g.*, *Hubbard Chevrolet Co. v. Gen. Motors Corp.*, 873 F.2d 873, 876 (5th Cir.1989)(declining to read a broader definition of " coercion" under Mississippi dealer's act because there is " no evidence indicating that the Mississippi statute's further definition of ' coerce'

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

represents an effort to broaden the scope of ' good faith.' " ); *Gage v. Gen. Motors Corp.,* 796 F.2d 345, 350-51 (10th Cir.1986)(assuming that federal case law interpreting " coercion" under the ADDCA also governed the similar language in the Colorado statute); *Subaru Distrib. Corp. v. Subaru of Am.,* 47 F.Supp.2d 451, 465, n. 9 (S.D.N.Y.1999)(noting that " coercion" has been interpreted to have the same meaning under both the New York Dealer Act and the ADDCA); *Colonial Dodge,* 11 F.Supp.2d at 744 (holding that " [w]hile there are slight differences between the state and federal statutes, ' coercion' under both the State Act and the ADDCA embodies the same concept, and accordingly the same analysis applies." ).

[11] We find these cases instructive, and agree with the district court that " coercion" holds the same meaning under both the state dealer acts and the ADDCA.***48** [FN13] The Rhode Island Supreme Court has already defined its own state dealer statute as such: " we define coercion as ' a wrongful demand which will result in sanctions if not complied with.' " *Dunne Leases Cars & Trucks, Inc. v. Kenworth Truck Co.,* 466 A.2d 1153, 1160 (R.I.1983)(quoting *Marquis v. Chrysler Corp.,* 577 F.2d 624, 633 (9th Cir.1978) (quoting *Fray Chevrolet Sales, Inc. v. General Motors Corp.,* 536 F.2d 683, 685 (6th Cir.1976))). As for Massachusetts, Maine, and Vermont,[FN14] the fact that their state legislatures have not defined " coercion" suggest that they did not intend to give the word a different meaning than it has in the ADDCA. While we are not bound by the same restrictions under ADDCA because the state legislatures did not define " coercion," *cf. General GMC,* 918 F.2d at 309 (reasoning that because the state counterpart to the ADDCA does not define " bad faith" or " good cause," a court is not bound by the same restrictions as under the ADDCA in determining " bad faith" ), we see no reason to depart from its federal meaning in this case. As for New Hampshire, the fact that its definition of " coercion" mirrors the ADDCA language suggests that it holds the same meaning of wrongful conduct and threat of sanctions as the ADDCA.

FN13. Moreover, the argument that " coercion" holds different meanings under different state dealer statutes negates the presence of " common questions of law" necessary for class certification. *See* Fed.R.Civ.P. 25(a).

FN14. Vermont makes it unlawful to " require or to coerce" dealers into purchasing unordered accessories. Vt. Stat. Ann. tit. 9, § 4096. For analysis of the " require" component, see next paragraph.

[12] Finally, the fact that Connecticut does not mention " coercion," but merely makes it unlawful to " require" dealers to purchase unordered accessories, does not warrant reversal on the state dealer statute issue. We simply fail to see how SNE is " requiring" dealers to purchase accessories in the discretionary and turndown cars when dealers need not purchase these cars in the first place; individual dealers have no contractual obligation to receive or purchase any cars beyond the regular allocation process. Since dealers are not " required" to purchase these accessories, no genuine issue of material fact exists under the Connecticut statute.

For the foregoing reasons, we affirm the district court's summary judgment on the state dealer statute claims.

### *C. State Contract Claims*

[13] Appellants also allege that SNE breached its contractual obligation to allocate cars " fairly and equitably" by concealing the true terms for allocating discretionary and turndown cars: the purchase of accessories. We are not convinced.

SNE's franchise agreement with each dealer obligates SNE to " perform[ ] its obligations under the Agreement in a lawful and ethical manner," including " allocat[ing] all affected Subaru products equitably, using appropriate factors." Fair Share II similarly expressed SNE's desire to allocate vehicles " in a manner that, in SNE's opinion, will maximize the business opportunity for both SNE and its dealers consistent with SNE's desire to allocate vehicles *fairly and equitably.*" (emphasis added). Fair Share II is silent on turndown vehicles, but describes discretionary cars as " [v]ehicles to be used as demonstrators by [SNE]; vehicles used for *major* auto shows; vehicles set aside to assist dealers who, at the sole discretion of [SNE], need assistance and vehicles delivered to VIPs." (emphasis in original). Fair Share II also refers to discretionary cars as potentially used for " market action," an undefined term.

***49** [14] Appellants argue that SNE breached these

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

contractual obligations and deceived dealers (1) by not stating that it intended to sell discretionary cars only with accessories, (2) by not stating anything about turndown cars, and (3) by using discretionary cars to encourage the purchase of accessories in regular allocation cars. Viewing the evidence in the light most favorable to appellants, and reviewing the district court's holding *de novo*, [FN15] we nonetheless find that SNE did not breach its contract with the dealers.

FN15. " Contract interpretation is often said to be ' a question of law' for the trial judge and, accordingly, subject to de novo review by the appellate court." *Principal Mut. Life Ins. Co. v. Racal-Datacom, Inc.*, 233 F.3d 1, 3 (1st Cir.2000) (citing *Commercial Union Ins. Co. v. Gilbane Bldg. Co.*, 992 F.2d 386, 388 (1st Cir.1993)). For " disputes of fact relating to the construction of contract terms," however, " those findings are subject to deference on review." *Id.* (citing *United States Liab. Ins. Co. v. Selman*, 70 F.3d 684, 687 (1st Cir.1995)).

First, we reject appellants' argument that SNE breached its contractual obligation to distribute all Subaru products " fairly and equitably" by failing to state its intent to sell discretionary cars only with accessories. " Every system has pluses and minuses, and a fair allocation system does not mean one without wrinkles." *Coady*, 361 F.3d at 58. For example, we recently noted that a distributor's failure to have a " written policy" on a particular method of allocation is " not itself arbitrary or unfair," especially when the " allocation system depends, to some extent, upon each district manager's discretion in offering vehicles to dealers." *Id.* at 58. We have also upheld a district court finding that a manufacturer did not breach its contract to distribute cars " fair[ly] and equitab[ly]" during a time of increased shortage, as long as the dealer received all that it was entitled to receive under the contract. *Narragansett Motors v. Packard Motor Car Co.*, 193 F.2d 545, 546 (1st Cir.1951).

Here, although we would have preferred that SNE explicitly stated its conditioning practice in the contracts, we nonetheless conclude that SNE did not breach its contractual obligation to distribute all Subaru products " fairly and equitably." SNE's failure to state its conditioning practice in the contracts, standing alone, is insufficient to find a breach of its contractual duty of fair and equitable allocation. *See Coady*, 361 F.3d at 58. Discretionary vehicles, by their very nature in the contracts,[FN16] are distributed at the " discretion" of SNE, subject only to a " fair and equitable" allocation. The fact that dealers have received all that they were entitled to receive under the contract-through regular allocation vehicles comprising 88% of all cars distributed during the class period-supports a finding of " fair and equitable" allocation. *See Narragansett Motors*, 193 F.2d at 546. Moreover, the fact that *all* dealers had to purchase accessorized discretionary cars if they wanted access to such cars supports a finding of " equitable" allocation. Thus, along with the fact that neither the Dealership Agreements nor Fair Share II forbids SNE's accessorization of discretionary cars, we find that SNE did not breach its contract to " fairly and equitably" distribute discretionary cars.

FN16. Fair Share II specifies that discretionary vehicles will be set aside, *inter alia*, " to assist dealers who, at the *sole discretion* of Subaru of New England, need assistance." (Emphasis added).

[15] Under the same analysis, we likewise reject appellant's argument regarding turndown cars. SNE's failure to have a written policy on turndown cars, without more, does not render its allocation system ***50** unfair or inequitable. *See Coady*, 361 F.3d at 58. Since dealers received all that they were entitled to receive under the regular allocation process, and since turndown cars have already passed through this agreed-upon regular allocation process, we do not find that SNE breached its contract. *See Narragansett Motors*, 193 F.2d at 546.

[16] Finally, we reject appellants' argument that SNE breached it contracts by using discretionary cars to encourage the purchase of accessories in regular allocation cars. We defer to the district court's factual finding that " more than 88% of all vehicles were initially allocated under Fair Share II using a formula that did not take into account whether a dealer had agreed to purchase accessories." *George Lussier*, 286 F.Supp.2d at 101.

Therefore, since appellants " provide[s] no reason to suppose that allocation system claims that have failed under the statute should prevail under the contract, ... no more need be said about this contract-claim perspective." *Coady*, 361 F.3d at 59. We uphold the district court's grant of summary judgment on these

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

proximate cause of the plaintiffs' injuries. *Id.* at 268, 112 S.Ct. 1311; *Camelio v. Am. Fed'n,* 137 F.3d 666, 669-70 (1st Cir.1998)(dismissing plaintiff's RICO claim and explaining proximate causation requirements under 18 U.S.C. § 1964(c)). Otherwise, plaintiffs may not recover in a civil RICO claim if their injuries are so far removed from the defendant's acts that they are indirect and derivative. *Holmes,* 503 U.S. at 268-69, 112 S.Ct. 1311 (holding that plaintiff did not have standing because his injuries were indirect as his losses were purely contingent on the insolvency of third parties).

Here, dealers fail to establish a " direct relation between the injury asserted and the injurious conduct alleged." *See id.,* 503 U.S. at 268, 112 S.Ct. 1311. The " injurious conduct alleged" involves the fraudulent concealment of SNE's option-packing scheme. The " injury asserted" involves costs associated with the (1) purchase of unwanted accessories, (2) payment of floor plan interest for accessorized vehicles that took longer to sell, and (3) reductions in the value of their dealerships. The injury asserted, however, was directly caused by the option-packing scheme, rather than the fraudulent scheme of concealment. Dealers fail to offer any evidence that the alleged fraud directly caused specific injuries, such as a dealer signing a dealer contract or making substantial investment in a dealership as a result of the fraud. Although SNE's alleged fraudulent conduct may have contributed to dealers' specific injuries-*i.e.,* buying unwanted accessories, paying floor ***52** plan interests, reducing the value of their dealerships-such indirect and derivative injuries are insufficient to have standing in a civil RICO claim. *See Holmes,* 503 U.S. at 268-69, 112 S.Ct. 1311.

[24] For the foregoing reasons, appellants' civil RICO claims fail as well.[FN19] Finally, since the only claim against the late Ernest Boch individually is the failed civil RICO claim, we need not decide appellants' last issue of whether the district court erred in denying their motion to substitute defendants.

FN19. Since appellants lack standing to state a civil RICO claim, this ends our inquiry. Nevertheless, we note that appellants' civil RICO claim would also fail as a matter of law because they could not establish that SNE used an " enterprise" as a vehicle for racketeering, thus corrupting an otherwise lawful enterprise. *See Nat'l Org. for Women v. Scheidler,* 510 U.S. 249, 259, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994); *United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981). Appellants allege that the New England Subaru Dealer Network, which presents dealer concerns to SNE through its Advisory Board, constitutes a RICO " enterprise." Far from a prototypical RICO enterprise, however, there is no evidence that SNE " was able to commit the predicate [racketeering] acts by means of, by consequence of, by reason of, by the agency of, or by the instrumentality of its association with the enterprise" -the Dealer Network. *United States v. Marino,* 277 F.3d 11, 27 (1st Cir.2002). *See also Fitzgerald v. Chrysler Corp.,* 116 F.3d 225, 227-28 (7th Cir.1997)(describing a prototypical RICO case as one where the " defendant gains additional power to do evil by taking over a seemingly legitimate enterprise" ). Since SNE did not gain additional power to " racketeer" and engage in mail and wire fraud by " taking over" the Dealer Network, appellants' RICO claim fail as a matter of law.

In closing, we note that SNE " ought to reflect that it has enjoyed a measure of good fortune in escaping unscathed in this lawsuit." *Cf. Coady,* 361 F.3d at 62. Its allocation and concealment practices were no model of perfection; individual dealers could plausibly pursue claims that SNE used other coercive means to induce dealers to purchase accessories. *See George Lussier,* 286 F.Supp.2d at 93. Nonetheless, with regard to the class action claims and issues on this appeal, the judgment is

***Affirmed.***

C.A.1 (N.H.),2004.
George Lussier Enterprises, Inc. v. Subaru of New England, Inc.
393 F.3d 36, RICO Bus.Disp.Guide 10,794

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.