UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| BALD HILL REALTY CO. d/b/a BALD HILL SUBARU | : | |
| Petitioner, | : | |
| v. | : | C.A. No. 07-298S |
| SUBARU OF NEW ENGLAND, INC. | : | |
| Respondent. | : | |

**PETITIONER'S MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION**

Petitioner Bald Hill Realty Co., d/b/a Bald Hill Subaru ("Bald Hill") hereby moves for the entry of a temporary restraining order and/or preliminary injunction pursuant to Fed. R. Civ. P. Rule 65 against Respondent Subaru of New England, Inc. ("SNE") enjoining the Respondent from terminating Bald Hill's franchise, on the grounds that SNE has violated R.I. Gen. Laws 31-5.1-4. SNE has issued a termination notice of Bald Hill's franchise as of September 10, 2007, which would close Bald Hill's Subaru dealership and moot the controversy, before this Court has had time to decide whether SNE's termination of the franchise is legal under the applicable statute, as it must be in order for the termination to be legally valid. Bald Hill submits that the termination has no reasonable basis under the statute and that an injunction is necessary to preserve Bald Hill's business until the matter can be fully and finally decided upon evidence.

WHEREFORE, Bald Hill requests that this Honorable Court enjoin SNE from terminating Bald Hill's franchise until this matter may be decided upon evidence at trial, grant Bald Hill its reasonable attorney's fees and costs, and grant Bald Hill such other and further relief as this Court deems meet and just.

In connection with this Motion, Bald Hill relies upon the accompanying Memorandum of Law and its exhibits.

Bald Hill hereby requests oral argument pursuant to LR Cv 7(e) and requests one-half hour to argue its motion.

BALD HILL REALTY CO d/b/a
BALD HILL SUBARU,
By its attorneys,

/s/ Michael J. McEntee
Michael J. McEntee, Esq. (#2092)
McEntee & McEntee
915 Tollgate Road
Warwick, RI 02886
(401) 823-3313
(401) 826-0950 (fax)
mmcenteelaw@verizon.net

**CERTIFICATION**

I hereby certify that the foregoing Petitioner's Motion for Temporary Restraining Order and/or Preliminary Injunction was filed electronically with the United States District Court for the District of Rhode Island and is available for viewing and downloading from the Electronic Case Filing system. The following attorneys received service by electronic means on this 4th day of September, 2007:

Mitchell R. Edwards
Hinckley, Allen & Snyder
50 Kennedy Plaza, Suite 1500
Providence, RI 02903-2393
medwards@haslaw.com

Heidi A. Nadel
Todd & Weld, LLP
28 State Street, 31st Floor
Boston, MA 02109

/s/ Michael J. McEntee

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

BALD HILL REALTY CO. d/b/a :
BALD HILL SUBARU :
:
Petitioner, :
:
v. : C.A. No. 07-298S

SUBARU OF NEW ENGLAND, INC. :

Respondent. :

**PETITIONER'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION**

Petitioner Bald Hill Realty Co., d/b/a Bald Hill Subaru ("Bald Hill") hereby moves for the entry of a temporary restraining order and/or preliminary injunction pursuant to Fed. R. Civ. P. Rule 65 against Respondent Subaru of New England, Inc. ("SNE") enjoining the Respondent from terminating Bald Hill's franchise, on the grounds that SNE has violated R.I. Gen. Laws 31-5.1-4. SNE has issued a termination notice of Bald Hill's franchise as of September 10, 2007, which would close Bald Hill's Subaru dealership and moot the controversy, before this Court has had time to decide whether SNE's termination of the franchise is legal under the applicable statute, as it must be in order for the termination to be legally valid. Bald Hill submits that the termination has no reasonable basis under the statute and that an injunction is necessary to preserve Bald Hill's business until the matter can be fully and finally decided upon evidence.

## FACTUAL BACKGROUND

SNE is the New England manufacturer/distributor of Subaru products, including new motor vehicles. Bald Hill does business in Warwick, Rhode Island as a franchise and dealer of Subaru motor vehicles. Bald Hill is SNE's franchisee.

On November 14, 2006, SNE sent Bald Hill a letter entitled: Notice of Sales Performance Deficiencies, Breach of Subaru Dealer Agreement and Intention to Terminate Subaru Dealer Agreement and Franchise, as SNE was required to do under R.I. Gen. Laws § 3 1-5.1-4 (d)(2)(i) & (ii), which legally restricts the ability of a franchisor to terminate a motor vehicle franchise. In said letter, SNE enumerated various performance criteria that SNE stated Bald Hill was required to achieve by May 31, 2007; otherwise, SNE would send Bald Hill a termination letter terminating Bald Hill's franchise with SNE. The applicable statute requires that SNE's performance criteria must be reasonable (see R.I. Gen. Laws § 31-5.1-4 (d)(2)(i) & (ii) but SNE's performance criteria were unreasonable for several reasons, including the fact that the six-month sales objective (288 new Subarus) was nearly equal to the twelve-month objective for membership into SNE's 2007 Presidential Club (317 new Subaru sales). SNE knew from its own sales figures that Bald Hill's highest sales were 467 new Subaru sales in a single year, half of which is 234. Over the six-month period between December 1, 2006 and May 31, 2007, new Subaru sales by the fourteen dealerships within Bald Hill's district ranged from 57 to 274, with an average of 140; neither Bald Hill nor any other dealer in the district achieved 288 new sales. Bald Hill's actual reported sales for that period were 141, just above the district-wide average for sales over that same period. Not surprisingly, Bald Hill was unable to meet the benchmarks in SNE's notice as they were patently unreasonable in light of the prevailing economic conditions.

SNE violated the notice requirements of R.I. Gen. Laws § 31-5.1-4 (d)(2)(i) & (ii) in that the performance criteria and related mandates set by SNE for Bald Hill were unreasonable. As a result, SNE has failed to provide good cause for the termination in violation of R.I. Gen. Laws § 31-5.1-4 (d) and further SNE's action in its termination letter was arbitrary, in bad faith and unconscionable.

By letter dated June 6, 2007, SNE issued Bald Hill a letter of termination with an effective date of September 10, 2007. Bald Hill contends that this termination letter violated various requirements and obligations under the Rhode Island's "Regulations of Business Practices Among Motor Vehicle Manufacturer's Distributors and Dealers," R.I. Gen. Laws § 31-5.1-1 *et seq.* (the "Statute")

After receiving the termination letter, Bald Hill engaged in significant efforts to resolve the issues between the parties. In order to accommodate vacation schedules, a settlement meeting was scheduled for July 10, 2007. Nevertheless, by letter dated June 29, 2007, counsel for SNE notified Bald Hill that a complaint for declaratory judgment had been filed by SNE against Bald Hill with this Court, but not served. See Subaru of New England, Inc. v. Bald Hill Realty Co. d/b/a Bald Hill Subaru, C.A. No. 075-249-S. The settlement meeting went forward on July 10, 2007 and on July 12th the parties met again, this time without their lawyers present. Then they had a meeting via telephone conference at which they scheduled an in-person meeting for July 20th . After the July 20th settlement meeting was scheduled, and without warning, SNE served Bald Hill with the Declaratory Judgment Complaint, on July 19, 2007.

**STANDARD OF REVIEW**

Under certain circumstances, when one party reasonably fears that irreparable injury will result, a temporary restraining order may be granted to preserve the status quo until the court has

an opportunity to rule on the application for a preliminary injunction. See United States v. United Mine Workers, 330 U.S. 258, 293, 67 S. Ct. 677 (1947) (district court had power to preserve existing condition while it was determining its own authority to grant injunctive relief).

When a temporary restraining order is granted on notice, it may be treated by the court as a motion for a preliminary injunction. See Kansas Hosp. Ass'n v. Whiteman, 835 F. Supp. 1548, 1551 (D. Kan. 1993) (ten-day limitation was inapplicable when request for temporary order of protection was made with notice; such request is treated like motion for preliminary injunction).

Notice to the non-moving party and a hearing are required for the entry of a temporary restraining order absent exigent or extraordinary circumstances. See EEOC v. Steamship Clerks Union, Local 1066, 48 F.3d 594, 608 (1st Cir. 1995). A temporary restraining order may be ten days in duration and may be extended, for good cause shown, for an additional ten-day period. ~~See~~ United States v. United Mine Workers, 330 U.S. 258, 301, 67 S. Ct. 677, 91 L. Ed. 2d 435 (1947). An extension may be granted for a longer period if the party against whom the order is directed consents to the extension. See Fernandez-Roque v. Smith, 671 F.2d 426, 429 (11th Cir. 1982) (temporary restraining order extended beyond twenty-day period with consent of party restrained was treated as temporary restraining order by court of appeals for purposes of appeal). A temporary restraining order also may be deemed a preliminary injunction if it remains in effect beyond ten days. See In re Arthur Treacher's Franchise Litig., 689 F.2d 1150, 1153-1155 (3d Cir. 1982) (temporary restraining order extended by consent of both parties was deemed order of preliminary injunction).

Generally, in the First Circuit, in evaluating whether to grant an injunction, the Court considers four well-known factors: (1) the moving party's likelihood of success on the merits; (2) whether there is a substantial risk that the moving party will suffer irreparable harm in the

absence of an injunction; (3) whether such risk of harm outweighs the risk to the non-moving party; and (4) whether the granting of an injunction will not adversely affect the public interest. See, e.g., Biogen Idec MA, Inc. v. Trustees of Columbia Univ., 332 F. Supp. 2d 286, 295 (D. Mass. 2004); see also Lanier Prof'l Servs., Inc. v. Ricci, 192 F.3d 1, 3 (1st Cir. 1999). Despite the familiar factors, however, their application in a particular matter is fluid rather than rigid, such that the various factors must be "weighed inter sese [among themselves]," Maram v. Universidad Interamericana de Puerto Rico, Inc., 722 F.2d 953, 958 (1st Cir. 1983), and evaluated subject to a "sliding scale" analysis, Gately v. Commonwealth of Massachusetts, 2 F.3d 1221, 1232 (1st Cir. 1993) cert. denied sub nom, Massachusetts v. Gately, 511 U.S. 1082 (1994). Accordingly, it is impermissible for the Court to evaluate any of the factors in a vacuum. Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 19 (1st Cir. 1996). Indeed, "the predicted harm and likelihood of success on the merits must be juxtaposed and weighed in tandem." Id. Consequently, "when the likelihood of success on the merits is great, a movant can show somewhat less in the way of irreparable harm and still garner preliminary injunctive relief." EEOC v. Astra USA, Inc., 94 F.3d 738, 743 (1st Cir. 1996) (emphasis added); see also Michigan Coalition of Radioactive Material Users, Inc. v. Griepentrog, 945 F.2d 150, 153 (6th Cir. 1991) ("Simply stated, more of one excuses less of the other.")

## LEGAL ANALYSIS

### 1. Bald Hill has a Substantial Likelihood of Success in this Action.

Applying the standards for injunctive relief to the instant case, it is clear that Bald Hill is entitled to an injunction preventing SNE from terminating Bald Hill's franchise. First, Bald Hill is able to demonstrate a substantial likelihood that it will prevail on the merits of its claim that SNE is attempting to terminate the franchise without a reasonable basis to do so under the

statute. See Affidavit of Elaine M. Notarantonio, Ph.D., attached hereto as Exhibit A. As set forth in the Affidavit of Elaine M. Notarantonio, Ph.D., the sales target that SNE set for Bald Hill (288 new sales in six months) was far in excess of what Bald Hill could reasonably be expected to sell. See Affidavit of Elaine M. Notarantonio, Ph.D. No dealership in Bald Hill's district sold 288 new Subarus over that time period. See Affidavit of Elaine M. Notarantonio, Ph.D. Bald Hill's actual sales during that time period were in line with the average sales of the other dealership within the district; they were not deficient in any way, except by reference to the unreasonable target of 288, which no dealership met. See Affidavit of Elaine M. Notarantonio, Ph.D.

**2. Bald Hill Will Suffer Irreparable Harm in the Absence of an Injunction.**

In order to establish irreparable harm, "a plaintiff need not demonstrate that the denial of the injunctive relief will be fatal to its business" although the denial of an injunction would certainly be fatal to Bald Hill's Subaru dealership, given SNE's intention to shut it down on September 10, 2007. Ross-Simons, 102 F.3d at 19. "It is usually enough if the plaintiff shows that its legal remedies are inadequate." Id. Consequently, if "the plaintiff suffers a substantial injury that is not accurately measurable or adequately compensable by money damages, irreparable harm is a natural sequel." Id. Monetary damages would not substitute for the value of Bald Hill's long-standing business enterprise, or its future value; only an injunction will avoid the irreparable injury of a permanent shutdown of an otherwise vital business.

**3. Bald Hill Has No Adequate Remedy at Law.**

It is clear that Bald Hill has made a substantial showing that it has no adequate remedy at law. In this regard, in the absence of an injunction preventing SNE from terminating the Franchise Agreement, Bald Hill will lose its Subaru dealership. As described in the preceding

section, monetary damages would be insufficient to compensate Bald Hill for the unjustifiable loss of its dealership. See Almond v. Capital Props., Inc., 212 F.3d 20, 25 (1st Cir. 2000) (district court may issue injunction against breach of contract if there is some reasonable doubt about whether damages can be an adequate remedy).

**4. An Injunction Will Result in No Harm to the Public Interest.**

There is no harm to the public interest in keeping Bald Hill open for business. If anything, the preservation of Bald Hill's dealership enhances the public interest because it allows Bald Hill to continue to provide Subarus to the public at competitive prices. In the absence of this dealership, Subarus would become less available to the buying public, the City of Warwick would lose the tax revenue that Bald Hill generates, and the reduced market and reduced revenues would have a negative impact on the public interest; but an injunction would protect the public from these harms.

Bald Hill respectfully refers this Court to the attached affidavit of Elaine M. Notarantonio, Ph.D., attached hereto as Exhibit A.

WHEREFORE, Bald Hill requests that this Honorable Court enjoin SNE from terminating Bald Hill's franchise until this matter may be decided upon evidence at trial, grant Bald Hill its reasonable attorney's fees and costs, and grant Bald Hill such other and further relief as this Court deems meet and just.

Bald Hill hereby requests oral argument pursuant to LR Cv 7(e) and requests one-half hour to argue its motion.

BALD HILL REALTY CO d/b/a
BALD HILL SUBARU,
By its attorneys,

/s/ Michael J. McEntee
Michael J. McEntee, Esq. (#2092)
McEntee & McEntee
915 Tollgate Road
Warwick, RI 02886
(401) 823-3313
(401) 826-0950 (fax)
mmcenteelaw@verizon.net

**CERTIFICATION**

I hereby certify that the foregoing Petitioner's Memorandum in Support of Motion for Temporary Restraining Order and/or Preliminary Injunction was filed electronically with the United States District Court for the District of Rhode Island and is available for viewing and downloading from the Electronic Case Filing system. The following attorney received service by electronic means on this 4th day of September, 2007:

Mitchell R. Edwards
Hinckley, Allen & Snyder
50 Kennedy Plaza, Suite 1500
Providence, RI 02903-2393
medwards@haslaw.com

Heidi A. Nadel
Todd & Weld, LLP
28 State Street, 31st Floor
Boston, MA 02109

/s/ Michael J. McEntee

# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| BALD HILL REALTY CO. d/b/a<br>BALD HILL SUBARU | : | |
| Petitioner, | : | |
| v. | : | C.A. No. 07-298S |
| SUBARU OF NEW ENGLAND, INC. | : | |
| Respondent. | : | |

**AFFIDAVIT OF ELAINE M. NOTARANTONIO, PH.D.**

I, Elaine M. Notarantonio, Ph.D., hereby depose and state that the following facts are within my personal knowledge:

**PROFESSIONAL BACKGROUND**

1. A true and accurate copy of my resume is attached to this Affidavit, setting forth my qualifications, some aspects of which are set forth herein.

2. I received my Ph.D. in Experimental Psychology with a Concentration in Behavioral Marketing from the University of Rhode Island in 1989.

3. I received my M.B.A., with a Concentration in Marketing, from Suffolk University in 1976.

4. I received my B.S. in Business Administration, with a Concentration in Marketing, in 1974.

5. From 1979 to the present I have been a Professor of Marketing at Bryant University.

6. From 1991 to the present I have been a Marketing Research Consultant with a specialization in the automotive industry market.

7. I have served as an expert witness in approximately twenty-five (25) hearings and appeals of the Rhode Island Motor Vehicle Dealers License and Hearing Board.

**8.** I have published numerous articles on consumer behavior, and the names of the articles and the publications in which they were contained are listed in my attached resume.

**<u>BALD HILL / SNE FRANCHISE TERMINATION DISPUTE</u>**

9. On November 14, 2006 Subaru of New England (SNE) stated by letter to Bald Hill Subaru that Bald Hill has failed to perform its obligations as a Subaru dealer under its franchise agreement; furthermore, Bald Hill Subaru was notified that in accordance with Rhode Island Statutes, Title 31 Section 31-5.1-4 that... "In order for Bald Hill to cure its deficiencies, it must achieve the following:

a. Bald Hill Must sell at least 55% of the new Subarus sold into its Area of Responsibility ("AOR");

b. Bald Hill must sell 288 new Subarus between December 1, 2006 and May 31, 2007; and

c. Bald Hill must raise its SOLI purchase score up to at least the Regional average between December 1, 2006 and May 31, 2007; and maintain a satisfactory service SOLI score during that period as well.

10. These criteria were to be achieved by the end of the December 1, 2006 to May 31, 2007 monitoring period.

11. As acknowledged in SNE's letter to Bald Hill Subaru dated 5/24/07, Bald Hill Subaru achieved two of the criteria set: specifically, Bald Hill achieved a greater than 56% sell

into its AOR. In addition, Bald Hill sufficiently raised its SOLI purchase score (source: Subaru of New England, Inc.).

12. Criterion #2 states that Bald Hill must sell 288 new Subarus Between December 1, 2006 and May 31, 2007. This constitutes an unreasonable and arbitrary goal and does not constitute reasonable grounds for termination for the following reasons:

a. A stairstepping approach would be more in line with industry practice – not an "all-or-nothing" proposition. When providing remedial criteria, it is more realistic to set a series of smaller goals that ultimately lead to a desired goal;

b. The method SNE claims to use in calculating the 288 sales goal is inherently flawed; it relies entirely on a mathematical model which uses historical data. It calculates Subaru registrations as a percentage of total registrations for each model for New England and then applies those same percentages to the Warwick AOR. This method does not consider factors such as changes in the economy, socioeconomics, consumer preferences, the uniqueness of the Rhode Island market, or rural-urban differences. . [Lilien & Kotler, *Marketing Models]* [Boyles, Gerald V., Edwards, Charles E. (1982, April). Demographic Characteristics and Automobile Dealer Sales Performance. Business and Economic Review, *28(5)*, 36.

c. the 288 objective is annualized to 576 units; during the period 1979 to 2006, the highest annual sales figure ever achieved by Bald Hill was 467 units in 2000 (source: Subaru of New England; Bald Hill Subaru);

d. no dealers in the district achieved this sales figure during the monitoring period: even the #1 dealer in the district, Suburban Subaru, fell short of the sales

objective set for Bald Hill; Suburban Subaru's sales during the monitoring period were 274 units (source: Subaru of New England); and

e. average unit sales for all district dealers during the monitoring period was 140 units; Bald Hill's actual sales for the monitoring period of 141 units was slightly above the average (source: Subaru of New England).

13. SNE claims that "Bald Hill did not make progress toward achieving its minimum new Subaru sales requirement because they did not make reasonable efforts to do so"; but these claims suggest that it was fully within the dealership's control to achieve these artificially set objectives; a number of variables beyond the dealer's control were in operation:

a. At the time of the termination notice, the increased sales objective was set despite the fact that industry predictions were made that U.S. auto sales will slip to a nine-year low of 16.2 million units in 2007 [CSM Worldwide 12/13/2007];

b. Actual Subaru sales nationally were down 8.1% for 7/31/2007 YTD [source: Subaru of America, Associated Press Financial Wire 8/1/07].

14. During the monitoring period SNE announced the continuance of Subaru of New England's President's Club for 2007. According to SNE, this is a "premier club designed to reward the top 25% of SNE dealers... into this Premier Club". Bald Hill's 2007 objective is 317. This is well below the 288 monitoring period objective of 288 which is annualized to 576 units. Essentially the message from SNE is: "Bald Hill Subaru must achieve sales of 288 units in a 6-month period in order to keep its franchise (annualized: 576), but must only achieve sales of 317 units in a one-year period in order to be a premier dealer."

15. When sales objectives are set unreasonably high, dealerships must engage in practices that ultimately hurt consumers: It is well-recognized within the marketing arena that

dealers may engage in brutal price wars which often lead to questionable practices in order to lure consumers; some of these practices include "low-balling" or bait and switch pricing – the practice of initially quoting an extremely low price on a product in an attempt to obtain a sales commitment from a customer only to then inflate the price by adding (normally free) services at a high price. This tactic may result in a one-time sale but ultimately leads to poor customer relationships and brand image. Had Bald Hill engaged in more aggressive tactics, as SNE suggests it should have, those tactics may have been injurious to consumers.

16. In conclusion, it is my opinion to a reasonable degree of certainty that SNE has targeted Bald Hill Subaru for termination without cause; achievement of unit sales of 288 during the monitoring period, is an unreasonable criterion and does not constitute reasonable grounds for termination of Bald Hill's franchise.

17. As referenced above, Bald Hill was also notified in the November 14, 2006 letter that it must "maintain a satisfactory service SOLI score during that period as well" in order to avoid termination. The subjective criterion "satisfactory" was not supported by any objective criteria at all. It is impossible to assess by an objective measure what the subjective criterion "satisfactory" meant to SNE and how Bald Hill would reasonably be expected to meet it. Therefore it is also my opinion to a reasonable degree of certainty that this was an unreasonable criterion and that it does not constitute reasonable grounds for termination of Bald Hill's franchise.

Elaine M. Notarantonio, Ph.D.

STATE OF RHODE ISLAND
COUNTYOF __/~'4~~~;~~I _

In the municipality of LV'](l, vICK on the 1 day of September, 2007, before me personally appeared Elaine M. Notarantonio, Ph.D., to me known and known by me to be the person executing the foregoing instrument and she acknowledged said instrument by herself executed, to be her free act and deed.

/'1."
~·;l.,
/t] ~

Notary Public ..' ." III<I My Commission Expires: ICI ,I!. llv

**ELAINE M. NOTARANTONIO, PH.D.**

Bryant University
Smithfield, RI 02917
(401) 232-6063 (office)
(401) 255-3621 (cell)
e-mail: enotaran@bryant.edu

---

**1979 – pres.** **PROFESSOR OF MARKETING**
Bryant University, 1150 Douglas Pike, Smithfield, RI 02917
Teach courses in: Foundations of Marketing, Advertising Mgt, Retail Management, Consumer Behavior, Personal Selling, Sales Management, Marketing Strategies, Services and non-profit marketing, Marketing Research

## 1991 – pres. MARKETING RESEARCH CONSULTANT

*Industry/market specialization*:

- Consumer market
- Retailing
- automotive industry expert
- teen market (generation y) expert
- marketing for non-profit and religious organizations expert
- the 21st century marketplace

*Methods specialization:*

- Competitive intelligence
- Focus groups
- Surveys
- Consumer Experiment

**Partial List of Clients and Projects:**

- **KVH Industries, Inc**. – Consumer and Dealer Product Perception Study
- **Lincoln Mall Redevelopment Project** – Economic Impact Analysis and Report to Planning Board
- **Expert Witness –** RI Dealer Licensing Commission (testified at approx. 25 hearings and appeals)
- **Rhode Island Automobile Dealers' Association** - "Economic Impact Study to Examine the Effects of Retail Inventory Tax".
- **Consumer Behavior in the Automobile Market** – Specialist and Expert Witness
- **Nissan Motor Corporation** - Conducted Market Study and provided expert testimony before R.I. Dealer Licensing Commission.
- **Needs Assessment/Strategic Planning –** Diocese of Providence, Diocese of Columbus and numerous religious organizations and automotive dealerships
- **Swarovski Optik of North America** - Product Positioning Study, Competitive Intelligence report
- **Uvex Safety, Inc.** - Consumer testing for new product; Market feasibility study for new product introduction
- **The Providence Visitor,** Catholic newspaper**.** Conducted readership study
- **The Four County Catholic**, Conducted readership study
- **UNCAS Manufacturing Company,** Strategic Market Analysis to identify growth opportunties**.**
- **Scientific Atlanta**, Analysis of product usage and perception

- **Grand'Italia of Milan**, Italy "Strategic Marketing Plan for entering the U.S. market"
- **Texas Instruments** -"Community Perception Study".
- **Providence Journal Company** - Study to determine "Information Needs and Usage Patterns of Organizational Decision-Makers".
- **Providence Journal Company** - Comprehensive Research report on "The 21st Century Marketplace"
- **GTech, Inc**. - Research Study on "The Effects of Gaming and Pari-Mutuel Betting on Revenue to the State of RI"
- **U.S. Government CIBED (project 2.5**) Study for Rhode Island Small Business Development Center to investigate underutilization of SBDC by technology-based firms.
- **Small Business Administration** - Contracted as consultant on more than 75 cases for numerous small businesses in Rhode Island
- **Marketing Training** Seminars for numerous organizations including profit, non-profit, service and manufacturing. Seminars included both on and off-site

## EDUCATION

**1989** **PH.D. IN EXPERIMENTAL PSYCHOLOGY**
University of Rhode Island, Kingston, RI
Concentration: Behavioral Marketing.
Dissertation topic: Sales Effectiveness and Communication Style

**1976** **MASTER IN BUSINESS ADMINISTRATION**
Suffolk University, Boston, MA
Concentration: Marketing

**1974** **BACHELOR OF SCIENCE IN BUSINESS ADMINISTRATION**
Bryant College, Smithfield, RI
Concentration: Marketing

### *Publications*

"The Effects of Limits in Retail Advertisements: A Reactance Theory Perspective" Psychology and Marketing, 1988, Vol 5(1) 33-44. (with Greg J. Lessne)

"The Effects of the Open and Dominant Communication Styles of Perceptions of the Sales Interaction" Journal of Business Communication Spring 1990, Vol 27(2) 171-184. (with Jerry Cohen)

"Salesperson Communication Style: The Neglected Dimension in Sales Performance" Journal of Business Communication, Winter, 1992. Volume 29(1) 63-77. (with Paul Dion)

“An Impact Discounts and the Price-Quality Effect Have on the Choice of an Institution of Higher Education". Journal of Marketing for Higher Education. Fall, 1999, Vol 9(2).1-17 (with C. Quigley, F. Bingham and K. Murray).

"The Affect of Price in the College Selection Process". Journal of Marketing Management., Fall, 1999 (with C.Quigley, K.Murray and F. Bingham).

"Marketing's Role in the Strategic Planning Process of a Religious Organization: A Case Study". Journal of Ministry Marketing and Management, Fall, 2001, Vol 6(2). 1-18 (with C.Quigley).

"Salesperson Communication Style: The Neglected Dimension in Sales Performance" Canadian Association of Administrative Sciences Proceedings, 1990. (with Paul Dion)

"The Relationship Between Communication Style and Sales Performance" Academy of Marketing Science Proceedings. 1990. (with Charles Quigley)

"Sex roles: Does Advertising Reflect the Culture". Academy of International Business Conference Proceedings, 1991. ( with Charles Quigley)

"An Examination of Sex-Roles in Advertising: A Cross-Cultural Perspective". Fifth Bi-Annual World Marketing Conference Proceedings, 1991. (with Charles Quigley)

"An Exploratory Investigation of Perceptions of Odd and Even Pricing". Academy of Marketing Science Proceedings 1992. (with Charles Quigley).

"Salesperson-Customer Dyadic Exchange: Using a Communicator Style Construct" Northeast Business and Economic Association Conference Proceedings, Fall 1992. (with F. Bingham and C. Quigley)

"The Communication Process in a Dyad: Implications for Personal Selling". Association of Marketing Theory and Practice Proceedings. March, 1993. (with C. Quigley and F.Bingham)

"Perceptual Dimensions of Odd and Even Pricing". Academy of Marketing Science Proceedings. May, 1993. (with C. Quigley).

"Using a Communicator Style Model to Improve Selling Efficiency in a Sales Dyad". Eastern Economic Association Proceedings March, 1995. (with C. Quigley and F. Bingham).

"The Use of Communication Style In a Buyer-Seller Dyad: Improving Buyer-Seller Relationships". Association of Marketing Theory and Practice Proceedings. March, 1996. (with C. Quigley and F. Bingham).

“Do Sales Managers and Their Salespeople Have Similar Beliefs About Control Outcomes?”, (F.Bingham and C. Quigley). October, 1997. Presentation at the Atlantic Marketing Association Conference.

“An Investigation of the Attributes Used in the College Application Process”. Ninth Symposium for the Marketing of Higher Education Proceedings. October, 1998 (with C. Quigley, F. Bingham and K. Murray).

"The Importance of Marketing in the Strategic Planning Process: A Parish Example" Association of Marketing Theory and Practice Proceedings. March, 2000. (with C.Quigley)

"The Role of Personality in Choosing Business as a Major: implications for Admissions Marketing". American Society of Business and Behavioral Sciences Proceedings. February, 2001. (with C. Quigley)

“Using ‘The Simpsons’ to Teach Marketing” Association of Business Research Proceedings, March 2003. (with C. Quigley)

“An Impact Discounts and the Price-Quality Effect Have on the Choice of an Institution of Higher Education". Journal of Marketing for Higher Education. Fall, 1999, Vol 9(2).1-17 (with C. Quigley, F. Bingham and K. Murray).

"The Affect of Price in the College Selection Process". Journal of Marketing Management., Fall, 1999 (with C.Quigley, K.Murray and F. Bingham).

"Marketing's Role in the Strategic Planning Process of a Religious Organization: A Case Study". Journal of Ministry

Marketing and Management, Fall, 2001, Vol 6(2). 1-18 (with C.Quigley).

"Automotive purchases and Consumer Decision-Making". (2006) Journal of Consumer Maketing, forthcoming.

## OTHER PROFESSIONAL

Recognized expert and speaker on *The Twenty-First Century Marketplace, The New Automobile Market, Marketing to Generation Y.*